UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

────────────────────────────────────────

ROBERT McFADDEN,

                                    Plaintiff,

        v.                                                          9:25-CV-1252
                                                                    (AJB/ML)

ANTHONY J. ANNUCCI, et al.,

                                    Defendants.

────────────────────────────────────────

APPEARANCES:

ROBERT McFADDEN
Plaintiff, pro se
14-B-3670
Mid-State Correctional Facility
P.O. Box 2500
Marcy, NY 13403


ANTHONY J. BRINDISI
United States District Judge

## DECISION and ORDER

### I.    INTRODUCTION

        The Clerk has sent to the Court for review a complaint submitted by pro se plaintiff

Robert McFadden asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), together

with an application to proceed in forma pauperis ("IFP") and a motion for injunctive relief.

Dkt. No. 1, Dkt. No. 1-1, Dkt. No. 1-2, Dkt. No. 1-3, Dkt. No. 1-4, Dkt. No. 1-5, Dkt. No. 1-6,

Dkt. No. 1-7, Dkt. No. 1-8 (collectively, "Compl.");[1] Dkt. No. 3 ("IFP Application"); Dkt. No. 2 ("First Motion for Injunctive Relief").[2]  Plaintiff, who is incarcerated at Mid-State Correctional Facility, has not paid the filing fee for this action.

## II.    IFP APPLICATION

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).[3]  "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id*. (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, the Court finds that plaintiff has submitted a properly completed and signed IFP Application along with an inmate account statement showing his prison balance

---

[1]  The complaint is 360 handwritten pages. Based on the size of the filing, the complaint is comprised of nine docket entries.  Page citations herein refer to the entirety of the pleading, as opposed to the docket number on which the referenced page appears.  By way of example, page 38 of the complaint appears at Dkt. No. 1-1 at 1, and is cited herein as page 38.

[2]  On October 1, 2025, the Court received an identical copy of the First Motion for Injunctive Relief, which is separately docketed as a Motion for Preliminary Injunction/Restraining Order.  *See* Dkt. No. 11 ("Second Motion for Injunctive Relief").  For the sake of clarity, the Second Motion for Injunctive Relief is denied as duplicative of the First Motion for Injunctive Relief.

[3] Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted.  28 U.S.C. § 1915(g).  Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

over the preceding six months, which, together, demonstrate economic need.  *See* 28 U.S.C.

§ 1915(a)(2).  Plaintiff has also filed the inmate authorization form required in this District.

Dkt. No. 4.  Accordingly, plaintiff's IFP Application is granted.

## III.    SUFFICIENCY OF THE COMPLAINT

### A.    Governing Legal Standard

Section 1915(e) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) .

. . the court shall dismiss the case at any time if the court determines that – . . . (B) the action

. . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii)

seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. §

1915(e)(2)(B).[4]   Thus, even if a plaintiff meets the financial criteria to commence an action in

forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly

maintain the complaint that he filed in this District before the court may permit the plaintiff to

proceed with this action in forma pauperis.  *See id*.

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action

in which a prisoner seeks redress from a governmental entity or officer or employee of a

governmental entity" and must "identify cognizable claims or dismiss the complaint, or any

portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim

upon which relief may be granted; or . . . seeks monetary relief from a defendant who is

---

[4] To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

immune from such relief."  28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution . . . in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted).  Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).  "[W]here the well-pleaded facts do not

4

permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id*. (internal quotation marks and alterations omitted).

### B.    Summary of the Complaint

The complaint, which is comprised of 360 handwritten pages, asserts allegations of wrongdoing by over 130 defendants arising out of plaintiff's incarceration at Mid-State Correctional Facility between July 2022 and the present, while in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Compl. The following facts are set forth as alleged in the complaint.[5]

### 1. Plaintiff's Past Confinement History

In August 2019, plaintiff was transferred to Mid-State Correctional Facility and placed in the Step-Down Program, which is "a special housing unit program for excessive

---

[5] Plaintiff originally submitted 264 pages of exhibits with his complaint. Dkt. Nos. 1-11, 1-12, 5, 5-1, 6, 6-1. Over roughly the next two weeks, the Court received approximately 70 pages of additional exhibits from plaintiff. *See* Dkt. Nos. 7, 8. One week after that, the Court received a second copy of the complaint, along with 870 pages of exhibits from an attorney representing plaintiff in another pending case. *See* Dkt. Nos. 10 thru Dkt. No. 10-36. Some of these exhibits overlap with the exhibits filed with the complaint. After this filing, plaintiff submitted over 250 pages of additional exhibits in support of his complaint and Motion for Injunctive Relief. *See* Dkt. Nos. 12, 13, 14, 15, 16, 17, 18. It is both burdensome and a waste of precious judicial resources to ask a court to sift through hundreds of pages of exhibits filed piecemeal, and with duplicates. Nonetheless, the Court has considered plaintiff's filings in connection with its sufficiency review herein.

disciplinary sanctions . . . for problematic prisoners[.]"  Compl. at 24.  On August 17, 2019, defendant Corrections Officer Annarino conducted an inventory and property review of plaintiff's belongings to identify "in-cell permitted items."  *Id.*  Defendant Annarino signed the inventory sheet and plaintiff's "non-permitted items were bagged [and] sealed then placed in temporary storage" pursuant to prison rules.  *Id.* at 25.  Thereafter, defendant Annarino authored a "partially" false misbehavior report against plaintiff, which "set the stage for a chain of [negative] events[.]"  *Id.*

At some point thereafter, defendant Deputy Superintendent of Programs Fischer "had plaintiff removed" from Mid-State Correctional Facility based on "unsafe conditions" and threats made against plaintiff.  Compl. at 25.  In or before 2021, plaintiff wrote to defendant then-acting Director of Special Housing Venettozzi to request that he "not be returned to Mid-State Step Down Program . . . due to the 2019 events[.]"  *Id.* at 26.  Plaintiff also "corresponded with" defendant Deputy Commissioner of Programs McCoy to raise the "same concerns" and "request[ ] a different program[.]"  *Id.* at 26-27.

On March 31, 2022, the "HALT Act . . . took effect[,]" placing "limits on confinement sanctions[,]" "redefin[ing] 'Segregated Confinement[,]'" and imposing "broad humane measures" on the treatment of certain prisoners.  Compl. at 27-28.[6]  At the time, plaintiff was

---

[6]  The Humane Alternatives to Long Term Solitary Confinement Act ("HALT Act") is "a New York State law, which took effect on March 31, 2022, and amends the standards in N.Y. Corr. Law § 137 governing treatment, control, and discipline at correction facilities[.]"  *Rivera v. Molina*, No. 23-CV-4128, 2023 WL 4847865, at *4-5 (S.D.N.Y. July 27, 2023); N.Y. Correct. Law § 137(6).  Among other things, the law limits segregated confinement [footnote omitted] to fifteen consecutive days and twenty days within any sixty-day period.  *See* N.Y. Correct. Law §

incarcerated at Fishkill Correctional Facility "recovering from a serious seizure [and] related injuries to [his] body[,] leg [and] speech." *Id.* at 28. Plaintiff was also "being treated for" (1) food allergies requiring a very strict restricted diet[,]" (2) seizures, (3) a spine condition for which he was prescribed pain medication, a back brace, and physical therapy, (4) certain digestive problems, and (5) Post Traumatic Stress Disorder for which he was prescribed Tegretol. *Id.* at 28-31.

In light of the changes to the law and plaintiff's conditions, defendants McCoy, former DOCCS Commissioner Annucci, and new Acting Director of Special Housing Rodriguez were "mandated" to "place [plaintiff] in a special population unit" at a different prison. Compl. at 31-32. Instead, these officials allowed plaintiff to remain in a Residential Rehabilitation Unit at Fishkill Correctional Facility until July 8, 2022. *Id.* at 32.

On or about July 8, 2022, defendant McCoy approved plaintiff's transfer back to Mid-State Correctional Facility, and defendant Venettozzi, who was working at Mid-State Correctional Facility as the First Deputy Superintendent, "disregarded the clear safety concerns" to plaintiff and, along with defendant Mid-State Superintendent Passage, "allowed [him] to be returned to Mid-State" by accepting his transfer to the facility. Compl. at 27, 32, 34. The transfer also occurred based on the failure of defendants Rodriguez, Annucci, and McCoy to adopt and implement alternative housing requirements as set forth in the HALT

---

137(6)(i); *New York State Corr. Officers & Police Benevolent Ass'n, Inc. v. Hochul*, 607 F. Supp. 3d 231, 236 (N.D.N.Y. 2022).

Act.  *Id.* at 32-33.  Despite the passage of time since plaintiff was last housed at this facility, "a lot of [the same] staff [members were] still working the Step-Down Program's housing unit," including defendants Fischer, Deputy Superintendent of Security Burns, Annarino, and Corrections Officer Matlock, all of whom were aware of the "constant group attacks [and] harassment" that plaintiff experienced in 2019.  *Id.* at 27.

At some point after plaintiff was returned to Mid-State Correctional Facility, defendant Daniel J. Martuscello, III became the Acting DOCCS Commissioner.  Compl. at 35.  However, this official "did not stop the unlawful [and] illegal practices" related to plaintiff's confinement conditions.  *Id.*  Instead, plaintiff "remained [and] still remains in the Step-Down Program, with even more additional physical disabilities[.]"  *Id.*

At some point in 2023, defendant Passage retired, and defendant Hilton became the Superintendent of Mid-State Correctional Facility.  Compl. at 35, 39.  However, this official also "did not stop the illegal practices" that deprived plaintiff of "his rights under [the] HALT Act" to be "placed in a special population unit[.]"  *Id.* at 35-36.

From 2022 to the present, plaintiff "has amassed several life threatening new diagnos[e]s" and been deprived of treatment for these conditions.  Compl. at 36-37.  Plaintiff has filed "uncountable grievances" with defendant Inmate Grievance Program Supervisor Tapia regarding his medical concerns and appealed the denial of those grievances to defendant Passage while he was Superintendent, and thereafter to defendants Hilton and Director of Inmate Grievance Program Rachel Seguin.  *Id.* at 37-38.  Plaintiff has also

verbally complained to defendants Passage and Hilton about the "medical torture [and] abuse" he has experienced when these officials made "weekly rounds" in plaintiff's housing area. *Id.* None of these officials took any action to address plaintiff's worsening condition. *Id.*

### 2. Medical Issues

Upon arriving at Mid-State Correctional Facility on or about July 8, 2022, defendant Primary Care Provider C. Hayes "confiscated . . . creams [and] shampoos" prescribed to plaintiff by a Dermatologist to address skin rashes, "without any examination whatsoever." Compl. at 40. Plaintiff had been using these medications since 2017, when he "had a[n] allergy attack [and] was hospitalized overnight[.]" *Id.* Plaintiff "also spoke to defendant Hayes about the symptoms that would soon happen without the creams [and] shampoos[.]" *Id.* at 41. Nonetheless, defendant Hayes "refused to provide the medications[,]" which plaintiff remained without for thirteen days. *Id.* at 40-41. Defendant Hayes informed plaintiff that he needed to be seen by the facility's provider, defendant Nurse Administrator Czerwinski, before he would receive any prescribed medications, without providing a date for plaintiff to be seen. *Id.* at 41-42.

Beginning in 2016, plaintiff was also "medically prescribed a Special Diet Order" to address "mandatory diet restrictions[.]" Compl. at 40. Plaintiff "explained" these facts to defendant Hayes and requested that "the Special Diet Order . . . be filled [out] by medical staff" and "follow up with food services in order for [him] to receive the correct meals[.]" *Id.*

9

Defendant Hayes "confirmed the allergen order through medical services [and] filled out the mandated paperwork [and] sent food services staff a copy of that medical diet."  *Id.* at 40-41. Plaintiff also signed for the medical diet.  *Id.* at 41.

Plaintiff's "medical diet order was provided to defendant FSA Deck, who had control over Food Services [and] related matters [and] operations."  Compl. at 41.

Following intake, plaintiff wrote to defendant Czerwinski "about all medications being confiscated with no exam or consult."  Compl. at 42.  Defendant Czerwinski did not respond to plaintiff's letter.  *Id.*

Roughly ten to twelve days after plaintiff arrived at Mid-State Correctional Facility, rashes, bumps, skin tearing, and open sores "began to reappear" on his body.  Compl. at 5. These symptoms "rapidly got wors[e] each day as the disruption continued with [his] medications."  *Id.*  Plaintiff "continued to fill out sick calls."  *Id.*

On July 20, 2022, plaintiff "was seen" by defendant Primary Care Provider Dr. Mohammed, who visited plaintiff at his cell door with two other corrections officials.  Compl. at 42-44.  As a result of "the extremely loud housing unit activity," defendant Mohammed spoke "loudly . . . about [plaintiff's] seizures [and] the symptoms of [his] groin rash in a[n] agitated manner."  *Id.* at 42-43.

Plaintiff "requested to be examined in the medical office[,]" which was in "very close proximity to [his] cell[.]"  Compl. at 43.  Defendant Mohammed denied plaintiff's request.  *Id.*

10

During this exchange, "several other prisoners . . . began making lewd, vulgar, [and] insulting remarks" directed at plaintiff's medical conditions.  *Id.*

At some point, defendant Mohammed "asked [and] demanded to see [plaintiff's] groin rash only."  Compl. at 44.  "Plaintiff then exposed himself to [defendant Mohammed and] the security staff . . . with her."  *Id.*  Based on the height difference between plaintiff and defendant Mohammed, "the height of the window [and] stains/scratches on the window, showing her was not even meaningful or possible due to her inability to see the areas [at issue]."  *Id.*

After attempting to examine plaintiff, defendant Mohamed stated that his condition was "only dry skin" and left before plaintiff could show her other outbreak areas on his body or "address medications."  Compl. at 44.  As a result of not having his medications re-ordered, plaintiff continued to experience bleeding rashes and open sores that burned and itched, causing discomfort and difficulty sleeping.  *Id.*  Plaintiff "continued to file sick calls requesting the dermatology creams [and] shampoos be reissued[,]" and "new eye glasses[,]" and "for food services to be contacted about [not providing him] the medical diet for allergens[,]" but it still took "over two weeks" to resolve these issues.  *Id.* at 45.

On or about August 8, 2022, plaintiff "filed a sick-call form with defendant Hayes requesting to review his medical files, receive medications confiscated upon arrival, [and] new eye glasses."  Compl. at 42.  Plaintiff provided defendant Hayes with his "broken pair of glasses at that time."  *Id.*

11

On August 11, 2022, plaintiff met with defendant Primary Care Provider Ferguson at his cell "about medications being stopped."  Compl. at 45.  Defendant Ferguson spoke to plaintiff "loudly[,]" and in the presence of "security officers."  *Id.*  Defendant Ferguson "denied plaintiff's request for a[n] exam/meeting in the medical station" and instead "continued to broadcast [plaintiff's] medical matters [and] concerns."  *Id.*  After some time, defendant Ferguson "looked at the rashes [and] bumps" on plaintiff's body and "reordered the Kenalog (steroid cream) that defendant Mohammed refused [and] discontinued."  *Id.*  Defendant Ferguson "also placed a request for another Dermatology consult with the specialist outside of the prison."  *Id.*

"Despite [plaintiff's] very clear need" for the medications that he had been without for "over 30 days[,]" defendant Ferguson "still reduced the previous order from twice daily to once per day" and "did not reorder the head [and] facial shampoos" previously prescribed. Compl. at 46.  Thereafter, plaintiff's symptoms "increased because of the[ ] interferences [and] disruptions [and] denials."  *Id.*  Plaintiff then "filed another grievance [and] wrote to . . . defendant Czerwinski about the problem [and] to request medical files again [and] . . . eye glasses."  *Id.*

After not receiving a response to his letter, plaintiff "addressed a sick call" to defendant Czerwinski, which he delivered to defendant Hayes, who shared an office with defendant Czerwinski.  Compl. at 46-47.  By October 2022, plaintiff "had filed an unknown amount of sick-calls [and] grievances on the medical staff[,]" with "no relief ever provided[.]"  *Id.* at 47.

On October 24, 2022, plaintiff "was formally approved" for the "Religious Allergen Free Diet."  Compl. at 53.  However, defendant Mohammed "refused to terminate the medical diet order[,]" which prevented plaintiff from "starting the Religious Allergen Free Diet."  *Id.*

"By November 7, 2022, the plaintiff was filing grievances that named defendant[s] Mohammed, . . . Czerwinski, . . . [and] Passage in each complaint."  Compl. at 48.  As of this date, plaintiff had filed "sick calls [and] daily complaints for 20 consecutive days" based on "stomach pains [and] the associated symptoms with an abnormal digestive system[.]"  *Id.* Defendant Czerwinski "allowed months [and] months to pass without even searching for [plaintiff's] medical file" or "assess[ing]" plaintiff's condition.  *Id.* at 49.

Around this same time, defendant Mohammed "stopped [plaintiff's] pain meds, then changed them after a prolonged delay, knowing plaintiff had chronic back [pain,] . . . a brace, and a tens unit" and "knowing plaintiff was not being allowed to attend the physical therapy sessions order[ed.]"  Compl. at 50-51.  Defendant Mohammed also deprived plaintiff of the "medication [and] equipment" he needed for "pain management" and "stopped the plaintiff's seizure medications abruptly" based on bloodwork results, without arranging for prompt review by a specialist.  *Id.* at 51.  As a result, plaintiff went over a year without seizure medications previously prescribed to him, and throughout this time, defendant Mohammed "did nothing but allow the plaintiff to physically deteriorate[.]"  *Id.*

On or around November 8, 2022, plaintiff filed a grievance against defendants Passage, Tapia, Deck, and Mohammed "for collusion to deprive the plaintiff of the Religious Allergen Free Kosher Diet" and causing him to miss "42 Kosher meals."  Compl. at 54.

At some point in 2023, defendant Primary Care Provider Dr. Abdelwahab "replac[ed] defendant Mohammed."  Compl. at 52.  This official also "refused to reorder [plaintiff's] seizure meds, medical boots, [and] knee brace," refused to schedule plaintiff for back and knee scans, and refused to "ensure [plaintiff's] Hematology appointment was scheduled promptly[,] urgently[,] [and] correctly."  *Id.*  Defendant Abdelwahab also "refused to follow DOCCS Health Service Policy 1.24A" regarding pain management and stopped one pain medication to "prescribe another . . . which had been medically proven to cause stomach problems [and] blood clotting" in plaintiff.  *Id.*  In addition, defendant Abdelwahab "refused to provide anything for the blood problem, pain problems, weight loss, or eye glasses" and, as with defendant Mohammed, "refused to sign the mandatory forms that would allow the plaintiff to terminate the medical diet order [and] restart the Religious Allergen Free Kosher Diet."  *Id.* at 53.

From late 2022 through the summer of 2023, defendant Primary Care Provider Paladino "regularly delayed refills for [plaintiff's] pain [and] stomach meds, derm. creams, tens unit battery replacements, tens unit patches [and plaintiff's] access to medical files[.]"  Compl. at 59.  This official also intentionally failed to file plaintiff's health proxy paperwork,

which plaintiff "handed to her" during medical rounds.  *Id.*  Defendant Czerwinski also failed to file this healthcare proxy, which plaintiff separately provided to her.  *Id.*

On May 8, 2023, at approximately 6:15 a.m., defendant Corrections Officer Hoffman notified plaintiff that he was scheduled for a medical trip and asked if plaintiff wished to attend.  Compl. at 57.  Plaintiff "affirmed he was going" and stated that he "need[ed] breakfast."  *Id.*  Defendant Hoffman left the area and indicated she would relay his response.  *Id.*  Roughly thirty minutes later, defendant Corrections Officer LaCoppola arrived at plaintiff's cell with the same inquiry as defendant Hoffman.  *Id.*  Plaintiff told this official the same things.  *Id.*

Roughly fifteen minutes later, defendant Christopher Hayes arrived at plaintiff's cell and indicated that he was informed that plaintiff "was refusing the medical trip."  Compl. at 57.  Plaintiff responded that he "did not say that[,]" repeated his desire to attend the trip, and requested breakfast.  *Id.*  Defendant Hayes "replied that [plaintiff] was already late [and] could get a bag lunch[.]"  *Id.*  Plaintiff advised defendant Hayes that he could not eat the bag lunch meal option because of his allergies, and that his "Special Diet Meal was already downstairs with all the other breakfast meals" as "nobody" had eaten at this point.  *Id.* at 57-58.  Defendant Hayes stated that he would check on the matter but never returned.  *Id.* at 58.  Plaintiff later learned that defendant Hayes left the building.  *Id.*

Roughly ten minutes later, defendants Corrections Officer Harris and Nurse Jane Doe "came around for meds."  Compl. at 58.  Plaintiff spoke with these officials about his medical

15

trip, and defendant Harris stated that she would "look into it." *Id.* Neither official ever returned. *Id.* Plaintiff later spoke with defendants OMH Social Worker Russell and Corrections Sergeant Mayo "about the problem" with defendant Hayes. *Id.*

Later that day, plaintiff filed a grievance, which defendant Tapia denied on the grounds that plaintiff was scheduled for a legal call and medical appointment at overlapping times. Compl. at 59. The Inmate Grievance Review Committee and defendant Tapia refused to review the recording of plaintiff's interactions with defendant Hayes. *Id.* Defendant Hilton subsequently affirmed the denial of the grievance and also refused to review the aforementioned recording. *Id.*

In or around June 2023, plaintiff "went to the medical unit for a[n] endoscopy/colonoscopy prep . . . after x-rays revealed air in [his] stomach" and other complications. Compl. at 59. Plaintiff spoke with defendant Paladino and Offender Rehabilitation Coordinator ("ORC") Brown regarding his healthcare proxy. *Id.* at 59-60. Defendant Paladino ignored plaintiff's request to ensure that the completed form was in his records, and defendant Brown "refused to allow plaintiff to file another . . . form" despite confirming that it was not in his files. *Id.* at 60. As a result, plaintiff underwent "a very serious medical procedure" without a healthcare proxy form on file. *Id.*

On or about July 19, 2023, plaintiff met with defendant Abdelwahab at his cell about his grossly swollen" knee and back pain. Compl. at 57. After speaking with plaintiff,

defendant Abdelwahab denied his request for an MRI, pain medication, and a knee brace or compression sleeve.  *Id.* at 57-58.

On August 7, 2023, defendant Corrections Officer Rosario arrived at plaintiff's cell to transport him for a medical trip.  Compl. at 57.  Plaintiff "confirmed that he wanted to attend the medical appointment" and "requested to speak [with] a supervisor or medical staff because [his] last medical trip . . . was intentionally manipulated" such that upon plaintiff's arrival to the medical facility, he was told that his appointment had been canceled.  *Id.* at 57-58.  Nobody ever met plaintiff at his cell, and his trip apparently never happened.  *Id.*

By August 10, 2023, plaintiff had continuously filed grievances detailing his inadequate medical treatment.  Compl. at 57.  Defendant Tapia did not process plaintiff's grievances related to his healthcare proxy and other "health problems" until receiving his detailed grievance "on medical torture" on August 10, 2023.  *Id.* at 60-61.  Plaintiff appealed defendant Tapia's denial of this grievance to defendant Hilton, who "denied the actions plaintiff requested therein."  *Id.* at 61-62.

On or around August 28, 2023, defendant Schrader "replac[ed] defendant Abdelwahab as plaintiff's primary care provider."  Compl. at 56, 62, 64.  As with past changes to plaintiff's primary care provider, this change "came with instant disruptions to prescriptions, refills, equipment, exams, [and] medical files[.]"  *Id.* at 56.

Between the spring and summer of 2023, defendant Nurse Aiken was responsible for collecting plaintiff's sick call slips during medical rounds, "relaying medical matters" raised in

those sick calls slips to defendant Schrader, and scheduling defendant Schrader's meetings and exams with inmates.  Compl. at 63.  On a daily basis, plaintiff showed defendant Aiken "visible swelling" on parts of his body.  *Id.*  "[A]fter visualizing all the gross swelling to plaintiff's knee, legs, [and] feet" on August 28, 2023, defendant Aiken told plaintiff that he was scheduled to see defendant Schrader in two days.  *Id.* at 64.  However, on August 30, 2023, defendant Schrader "refused" to visit plaintiff's housing unit "due to the yelling, screaming [and] banging on doors all around plaintiff's cell location."  *Id.*

Defendant Aiken then advised plaintiff that he would be seen by defendant Schrader on September 6, 2023.  Compl. at 64.  However, when that day arrived, defendant Schrader again refused to visit plaintiff's housing area "for the same reasons, according to Aiken."  *Id.* "This became a pattern of delays, from this point" to the filing date of the complaint.  *Id.*

On September 13, 2023, defendant Schrader visited plaintiff's cell and "loudly" listed his health conditions "for the entire housing gallery . . . to hear[.]"  Compl. at 62-63.  Although plaintiff had swelling throughout his body for over a year, defendant Schrader refused to examine him, and denied his request for medical boots, compression socks, a knee brace, medication for his back, knee, leg, and foot pain, and an MRI.  Compl. at 63.

Thereafter, plaintiff submitted a grievance regarding inadequate medical treatment, which resulted in defendant Schrader informing him that "medical records indicated [plaintiff was] refusing medical trips [and] failing to attend."  Compl. at 65.  Plaintiff informed defendant Schrader that the entries were false, that "nobody showed up for the trip, or with a refusal

18

form to be signed," and that his medical trips were being scheduled on the same dates that he had prescheduled legal calls, meetings, and court dates in order to prevent him from attending these appointments.  *Id.* at 65-66.

Plaintiff filed grievances against defendants Czerwinski, Aiken, Schrader, Health Services Director Chaudry, Social Worker Kallay, Nurse Dana, and Nurse Surgey related to the scheduling of his medical trips and legal matters on the same dates and times, including on May 8, May 16, May 19, May 30, June 3, June 6, and June 12, 2023.  Compl. at 66, 70. Plaintiff also wrote letters, emails, and made verbal complaint to defendants Assistant Deputy Superintendent of Mental Health Jennifer Christopher, Candy Hayes, Paladino, Dana, Hilton, Fischer, Harris, Storey, Fish, Kallay, Dorchester, Perham, Czerwinski, Schrader, Penree, Chaudry, Clapper, Abdelwahab, Schiavi, Nurse Practitioner Tourtelot, Costello, Yaddow, Ross, Hall, Klien, Mayo, Chandler, Hamilton, Dundden, Johnson, Carpenter, Bishop, and Murphy about this issue.  *Id.* at 70-71.

On October 3, 2023, plaintiff attended an initial Hematology appointment more than twelve months after it was first scheduled.  Compl. at 72.  Corrections Officer Lacoppola "was given plaintiff's medical file, put together by defendants Chaudry, Czerwinski, [and] Schrader . . . based on chain of command [and] customs previously explained by defendant[s] Dana, Clapper, Candy Hayes, Banks, [and] Brown[.]"  *Id.*  Upon arriving at the outside facility and meeting with a specialist, plaintiff was advised that no "labs [or] reports" were included in his medical file, and that bloodwork needed to be taken.  *Id.*

19

On or about October 8, 2023, "seventeen tubes of blood" were "taken from the plaintiff, who was then diagnosed with Leukopenia [and] Thrombocytopenia[.]"  Compl. at 72-73. Thereafter, plaintiff's follow-up appointments were repeatedly "botched[,]" resulting in a continued decline in plaintiff's condition.  *Id.* at 73.  At some point, after additional bloodwork, a specialist diagnosed plaintiff with iron anemia and "recommended iron pills, multi-vitamins" and improved nutrition.  *Id.*  However, defendant Schrader "refused to follow the recommendations for nutrition" from that point through the filing date of the complaint, resulting in plaintiff's loss of 60 pounds.  *Id.*

In January or February 2024, defendants Schrader and Penree examined plaintiff privately, during which time defendant Schrader "stated that she was filling out the mandatory DOCCS Policy Chronic Pain Management forms[,] . . . ordered an MRI for [plaintiff's] grossly swollen knee[,]" promised to "adjust [plaintiff's] pain meds to Gabapentin after [his] next Hematology consult[,]" and prescribed plaintiff medical boots and a pill for reducing inflammation.  Compl. at 74-75.  Defendant Schrader also prescribed plaintiff Tylenol despite knowing about plaintiff's "blood problems" and "refused to change" the prescription after plaintiff "mentioned the side effects" as the reason why the prescription was "previously stopped."  *Id.* at 75.  In addition, defendant Schrader "refused to change" plaintiff's pain medication order despite knowing the prescribed medication was causing him stomach pain. *Id*.

20

As a result of a negative reaction to one or more of the prescribed medications, plaintiff experienced digestive issues and lost "at least 10 pounds in under 30 days[.]"  Compl. at 76.

In or around "March/April" of 2024, defendant Schrader "had the plaintiff sent to the Orthopedic, who gave [him] a knee injection of cortozone after x-rays [and] exams" and "requested the MRI" for further evaluation.  Compl. at 77.  Plaintiff was eventually scheduled for an MRI on June 5, 2024, which revealed various structural deficiencies.  *Id.*

On August 28, 2024, plaintiff's scheduled follow-up appointment with the Orthopedic "was intentionally botched" by defendants Chaudry, Czerwinski and Schrader, who "gave the wrong address on the itinerary provided to the CERT escorts[,]" defendants Corrections Sergeant Walker and Corrections Officer Henry.  Compl. at 77.  Eventually, plaintiff arrived at the Cayuga Medical Center for his appointment, but the "necessary" medical records were omitted from his file by defendants Schrader, Czerwinski, and Chaundry.  *Id.* at 77-78.  As a result, the specialist "was unable to review [plaintiff's] MRI results to determine the corrective surgery procedure necessary," and instead had to reschedule the appointment.  *Id.* at 78.

As of April 2025, plaintiff's Orthopedic appointment had yet to be scheduled despite him sending "numerous emails [and] letters" to defendants Chaudry, Czerwinski, Schrader, Hilton, Fischer, Storey, and Harris.  Compl. at 78.  Plaintiff also "spoke to [and] filed sick calls [and] grievances with [and] against defendant Penree" regarding this issue.  *Id.*

21

During the same time that plaintiff was seeking treatment for his knee, he was denied "self carry meds," "nutritional supplements" and "proper pain management [treatment and] medications" by defendants Czerwinski, Schrader, Penree, Hilton, Storey, Chaudry, Bishop, and Jennifer Christopher.  Compl. at 79.  Plaintiff detailed his "chronic pain problems" and other medical conditions in grievances and sick call requests, yet defendant Schrader "never followed the course of care" discussed with plaintiff during his private evaluation with her in January or February 2024.  *Id.* 80.  Plaintiff also "continued to ask for physical therapy[,]" which was "denied based on malice" by defendants Christopher Hayes and Candy Hayes.  *Id.* at 80-81.

Refills of certain medications prescribed to plaintiff were also "delayed by weeks at a time on a habitual pattern once per month" by defendants Penree and Schrader, in response to plaintiff repeatedly filing grievances and complaints.  Compl. at 81-82.  On June 3, 2024, defendant Penree personally witnessed plaintiff's adverse skin condition, including irritation and discoloration on his face that "can only best be described as chemical burns[,]" which this official "blamed . . . on the commissary soap" without providing any treatment.  *Id.* at 83.

On June 4, 2024, corrections officials denied plaintiff's request for medical treatment during an escort back to his cell.  Compl. at 83-84.  After plaintiff returned to his cell, defendant Area Supervisory Chandler arrived to collect the handcuffs used during the escort.  *Id.* at 84.  Plaintiff explained to this official that he was in need of medical treatment, showed this official his injuries, and stated that "the cuffs needed to stay" so they could be used to

escort him to medical.  *Id.*  Plaintiff further stated that he was not refusing to return the handcuffs, but that he was "being refused medicine [and] treatment."  *Id.*  In response, defendant Chandler threatened to assault plaintiff if he did not return the handcuffs then left the area.  *Id.*

At approximately 3:30 p.m., defendants Corrections Officers Mazzone, Manson, and Hamilton "gave out the dinner trays [and] refused to take the handcuffs back [from plaintiff] and feed [him.]"  Compl. at 84-85.  Although plaintiff's skin condition continued to worsen, which he showed defendants Penree, Surgey, and Clapper, these officials refused to provide him with "medical skin cream" or arrange for him to be seen by defendant Schrader for roughly one month.  *Id.* at 85.

On June 26, 2024, plaintiff "also had another seizure in the middle of the night" and experienced "extreme nerve [and] muscle pain . . . down [his] back [and] legs."  Compl. at 86. Defendant Nurse Jane Doe #1 visited plaintiff at his cell and "did nothing."  *Id.*

On July 2, 2024, defendants Corrections Officers Smalls and Costello "forced" plaintiff to walk up "no less than 25-30 stairs" for a meeting with defendant Tourtelot despite plaintiff informing these officials of his leg, knee, and foot problems and "stability issues" and the availability of an elevator.  Compl. at 86-87.  Plaintiff then met with defendant Tourtelot, who "terminated [his] mental health medication," which also helped prevent seizures.  *Id.* at 87. Plaintiff asked defendant Tourtelot why she was terminating the medication, which he had

been taking since 2016 with only "minor [and] brief pauses[,]" and she responded, "because I am." *Id.* at 87-88.

During this time, defendants Chaudry, Czerwinski, Schrader, Christopher, Storey, Mosher, and Tourtelot were meeting weekly to discuss the medical treatment of prisoners, including plaintiff, and the medications ordered for these individuals. Compl. at 87. Following plaintiff's meeting with defendant Tourtelot, defendants Smalls and Costello returned to escort plaintiff back to his cell. Compl. at 88. As these officials "tr[ied] to guide the plaintiff toward the stairs" with his hands cuffed behind his back, plaintiff told them that he could not walk down stairs without holding a railing. *Id.* After defendants Smalls and Costello "insisted on the stairs[,]" plaintiff asked for a supervisor and was placed "in the area of the elevator." *Id.* at 88-89.

Thereafter, defendants Corrections Officer Ross and Corrections Sergeant Ferrone arrived at the scene with other unknown officials and defendant Costello yelled at plaintiff, called him names and expressed a desire to throw him down the stairs. Compl. at 89. Defendant Ferrone then told defendant Ross to "take over the escort" and "insisted" that plaintiff take the stairs, stating that prisoners were "no longer allowed to ride the elevator[.]" *Id.* Plaintiff said "okay" and "turned to go toward the stairs but was "snatched . . . by the bicept [sic]" and "pulled . . . forcefully backwards" by defendant Ross, "causing plaintiff to instantly collapse to the ground screaming in pain." *Id.* at 89-90. "Plaintiff was then

dragged/carried to a holding cell [and] dropped on the ground" where he was left "for over 1 hour" before defendants Penree and Hamilton arrived.  *Id.* at 90.

Defendant Penree told defendant Hamilton to escort plaintiff back to his cell "as plaintiff . . . turned on the floor."  Compl. at 90.  "Plaintiff was then lifted off the floor, still cuffed, [and] forced to walk to the elevator [and] back to his cell by [defendant] Hamilton[.]" *Id.*  "[U]nknown officers" executed the transport by "dragging" plaintiff along while he was "doubled over" in pain, "unable to fully stand straight up[.]"  *Id.*  Defendants Hamilton and Penree walked together behind plaintiff, telling him to "keep going" when he stopped and requested a wheelchair.  *Id.*

On August 19, 2024, plaintiff filed a grievance against defendants Chaudry, Czerwinski, Storey, Hilton and Penree based on "ongoing untreated medical problems[.]" Compl. at 91.

Between July and October 2024, and following the discontinuation of Tegretol by defendant Tourtelot, plaintiff suffered four seizures.  Compl. at 96.  Plaintiff's sick call requests related to these seizures "were thrown out" by defendants Schrader and Penree.  *Id.* at 96-97.  After one of these seizures, plaintiff was seen by defendant Penree who did nothing but ask plaintiff what he did to himself.  *Id.* at 97.  Following another of these seizures, defendant Nurse Jane Doe #2 arrived at plaintiff's cell but "[d]id not take vitals or photos" or undertake "any level of examination" and instead only prescribed Tylenol.  *Id.*

25

On a date prior to October 5, 2024, plaintiff was relocated to a "disability cell with wheelchair accommodations, including shower access."  Compl. at 92.  Following his relocation to this cell, plaintiff asked defendants Christopher, Hilton, Bishop, Storey, Fischer, Harris, Laliberte, Chaudry, Czerwinski, Schrader, Penree, Ferrone, Prisma, Hark, Johnson, Hamilton, and Russell each to provide him with a shower curtain for privacy and safety.  *Id.* at 93.

On October 5, 2024, plaintiff slipped and fell while exiting the shower as a result of water "pooling outside of the shower area due to no plastic shower curtain."  Compl. at 93.  Plaintiff "hit his head on the metal stools directly outside of the shower entrance[.]"  *Id.* at 94.  The next day, plaintiff showed defendant Penree his injuries and requested a shower curtain and injury report.  *Id.*  Defendant Penree touched plaintiff's head, said he would document the injuries, and then denied his request for imaging.  *Id.*

On October 7, 2024, defendant Penree again refused plaintiff's request for imaging on his brain.  Compl. at 95.  Defendant "CERT Female" was present for this evaluation.  *Id.*  Plaintiff told this official that he was in need of help.  *Id.*  Defendant Hamilton subsequently arrived at the scene to photograph plaintiff's injuries, but defendant Penree directed him to limit photographs to plaintiff's head.  *Id.* at 95-96.  Plaintiff asked defendant Hamilton for a shower curtain, and this official responded that defendant Christopher "told him not to give them out[.]"  *Id.* at 96.

Later that day, plaintiff spoke with defendant Hark at the Sergeant's Gallery, and this official told plaintiff that "he would try" to have photographs taken and an injury report done correctly because "Penree [and] Hamilton were doing some bullshit." Compl. at 97. However, defendant Corrections Sergeant Edick "refused" to address these matters, so "[n]othing was done[.]" *Id.*

On October 8, 2024, plaintiff delivered defendant Penree another sick call request and asked that all his injuries be documented and photographed. Compl. at 97-98. Defendant Penree refused plaintiff's request. *Id.* at 98. By this date, plaintiff "had filed over 12 consolidated medical grievances" regarding inadequate treatment by defendants Mohammed, Schrader, Czerwinski, Chaudry, Christopher, Hilton, Bishop, Storey, Fischer, Harris, Lileberte, Penree, Ferrone, Hamilton, Prisma, Walker, Johnson, Russell, Reddner, and Hark. *Id.*

Over the next two months, plaintiff continued to file grievances and sick call requests regarding inadequate medical treatment. Compl. at 98-103. At some point apparently in or around December 2024, defendants Penree and Schrader "told the plaintiff they wanted to check for sodium in his urine as a cause for weight loss" and plaintiff gave defendant Penree a urine sample in a cup. *Id.* at 106. About ten days later, plaintiff met with defendants Schrader and Penree and these officials informed plaintiff that he tested positive for amphetamines and as a result, would not be prescribed any medications. *Id.* Plaintiff "became outraged" and asked when they performed a drug test and for chain of custody

records.  *Id.*  Plaintiff never received a misbehavior report for drug use or any answers to his

questions.  *Id.* at 107.  Plaintiff subsequently filed a grievance, but "nothing was done" to

address the false charge.  *Id.*

On December 8, 2024, defendant Corrections Officer Shue delivered plaintiff a meal

tray that contained a banana and was missing yogurt.  Compl. at 111.  Plaintiff complained to

defendant Shue about being provided with a food to which he was allergic – the banana –

and being deprived of adequate nutrition.  *Id.*  After a verbal disagreement, defendant Shue

left the area, returned to advise plaintiff that he was not going to be provided with another

meal, and then requested that plaintiff remove his hands from the open slot in his cell.  *Id.* at

112.  Plaintiff then threw an empty cup out of his cell.  *Id.*  In response, defendant Shue

"jumped" and radioed for backup, stating that plaintiff "threw on [him]."  *Id.* at 112-113.

Roughly thirty minutes later, plaintiff was removed from his cell by defendants Ferrone,

Henry, Walker, Corrections Officer McGraw, and Corrections Lieutenant John Doe, and he

was told by Lieutenant John Doe that he was being placed in an "OBS" cell on suicide watch.

Compl. at 113.  Plaintiff was not suicidal.  *Id.*

Defendants Corrections Sergeant Patek, Henry, Walker, and McGraw escorted plaintiff

to the Mental Health Unit.  Compl. at 113.  On the way into the unit, plaintiff walked past

defendant Corrections Officer Gabel, who was holding the door open.  *Id.* at 114.  Once

inside, plaintiff "heard all body cameras being deactivated for audio" and was directed by

defendant Corrections Officer John Doe #1 to stand on the scale.  *Id.*  After plaintiff was

weighed, he was escorted to a "strip cage" where his handcuffs were removed.  *Id.*
Defendant Corrections Officer John Doe #2 directed plaintiff to strip and he was issued a
"suicide smock[.]"  *Id.*

By this time, defendants Walker, Henry, and McGraw "were all out of site," but
defendants Patek, Gabel, and Corrections Officers John Doe #1-5 were all nearby.  Compl. at
114-115.  Eventually, plaintiff was removed from the cell by defendants John Doe #1-5 and
relocated to a nearby cell.  *Id.* at 115.  Once inside, plaintiff "was immediately punched in the
head, and thereafter repeatedly punched all over his body while still in handcuffs.  *Id.*

Following the assault, defendant Patek directed defendant Gabel to "freeze [plaintiff]
out as he left" the area.  Compl. at 117.  Defendant Gabel then set a box fan inside the open
window near plaintiff's cell and "turned it on full blast."  *Id.*  Defendant Gabel also turned on a
box fan located in a different window in the back of the cell.  *Id.*  Nothing else was in the cell
except a metal bed frame that was covered in feces.  *Id.*

Plaintiff was not given lunch on this date or medications from defendant Penree, who
"came [and] laughed."  Compl. at 118.  The next morning, plaintiff was denied "a.m. meds
[and] breakfast."  *Id.*  Over the next three days, each of plaintiff's meals were either tampered
with or denied altogether.  *Id.*  Defendants Corrections Officer Hamlin, Corrections Officer
Rogers, and Corrections Officers John Doe #1-2 provided plaintiff with meals "sometimes."
*Id*.  The fans also remained on during most of this three-day period.  *Id.* at 119.

On or around December 11, 2024, defendants Penree and Corrections Officers John Doe #1-5 visited plaintiff at his cell, directed him to stand under a light, and then walked off. Compl. at 119.  Over the next two days, plaintiff was deprived of medication and a dinner meal by defendant Corrections Officer "John Doe Short Guy[,]" had a water bucket thrown at him by defendants "John Doe Short Guy" and "John Doe Tall Guy," and had a hose sprayed at him by these same officials.  *Id.* at 120.

Defendant Short witnessed plaintiff's confinement conditions between December 8 and December 13, 2024, having walked past the cell "several times" throughout this period. Compl. at 121.  Defendant Henry also worked one shift when plaintiff asked for the fans to be turned off and refused the request.  *Id.*  Plaintiff was deprived of his seizure medication while in OBS by defendants Penree, Brown, and Surgey, and had a seizure on one occasion.  *Id.* at 121-122.

On December 13, 2024, defendant Rogers provided plaintiff with blankets and food. Compl. at 121.  On or about December 16, 2024, plaintiff was released from OBS.  Compl. at 122.  At some point thereafter, plaintiff contacted the Office of Special Investigations, and an official from this office ordered that plaintiff receive a medical exam and chest x-ray.  *Id.* However, defendant Penree "filed false documents" and defendant Schrader "never did anything" and as a result, "the chest x-ray was never done."  *Id.*

On or about December 20, 2024, plaintiff had his second seizure in ten days.  Compl. at 108.  Plaintiff was escorted to the medical unit where defendants Penree and Ferrone were

present.  *Id.*  Plaintiff told these officials "about having another seizure" and defendant Penree "flashed a light into plaintiff's face while at the same time asking plaintiff about being on drugs."  *Id.*  Penree did not take any vitals.  *Id.*

Defendant Penree then asked plaintiff to provide a urine sample, which plaintiff did "on the spot[.]"  Compl. at 109.  Days later, defendant Penree stopped by plaintiff's cell during "med rounds" and "waved a paper" while informing plaintiff that he "tested positive again[.]"  *Id.*

On or around December 26, 2024, a Tier III disciplinary hearing was initiated against plaintiff based on the cup throwing incident that occurred on December 8, 2024.  Compl. at 127.  Defendant Laliberte was assigned as the hearing officer and allowed plaintiff to make an appearance on the record, after which the hearing was postponed to allow plaintiff time to receive assistance.  *Id.*

On December 31, 2024, plaintiff met with defendant ORC Lewis for tier assistance.  Compl. at 128.  Plaintiff asked defendant Lewis to gather certain evidence for his hearing.  *Id.*  Later that day, defendant Corrections Sergeant Lamoch interviewed plaintiff regarding an investigation into plaintiff's claims of wrongdoing by defendants Penree and Schrader.  *Id.*  Defendant Lamoch noted the "history of problems" between plaintiff and these officials and stated that he would take plaintiff for his chest x-ray.  *Id.* at 128-129.  However, defendant Lamoch later told plaintiff that the appointment was canceled and rescheduled.  *Id.* at 129.

During "mail delivery" on December 31, 2024, plaintiff received defendant Laliberte's Tier III disposition, which "falsely" indicated that plaintiff was "removed from the hearing for bad behavior[.]"  Compl. at 129.  Defendant Laliberte found plaintiff guilty of the charges in the misbehavior report and sentenced him to 180 of confinement in a special housing unit ("SHU") cell, along with loss of "all other privileges."  *Id.*

Later in the day, plaintiff spoke with defendant Corrections Sergeant Fann regarding the disciplinary disposition and this official "agreed it was false."  Compl. at 130.  Plaintiff appealed the disciplinary determination to defendant Rodriguez.  *Id.*  At some point, defendant Rodriguez "modified the sanctions [but] still ignored the fact that plaintiff's due process rights were violated by ample evidence [that he] was deprived [the opportunity] to be present [and] participate [in]" the hearing.  *Id.*  Pursuant to the modification in the sanction, plaintiff "was still regressed to Phase One in [the] Step Down Program" and lost contact visits, packages, and other privileges.  *Id.* at 131.

On January 2, 2025, plaintiff was escorted to a holding pen where defendants Shue, Penree, and Schrader were located.  Compl. at 123.  Plaintiff was seated on a bench, with his hands cuffed behind his back.  *Id.*  Plaintiff asked defendant Schrader "for an update on all his medical trips [and] sick calls given to Penree" and Schrader "yelled" at plaintiff in response and asked what he wanted.  *Id.*  After a further negative exchange, plaintiff "cleared his throat [and] suppressed a cough" and defendant Schrader "flinched."  *Id.* at 123-124.  Defendant Shue then "grabbed" plaintiff "by the arm [and] leg, lifted [him] off the bench [and]

threw [him] face first to the ground." *Id.* at 124.  Defendant Shue then "drove his knee" into plaintiff and "pinned it down" on plaintiff's legs, causing him "intense nerve pain[.]"  *Id.*

At that point, defendant Ross "rushed in the area [and] clamped leg shackles on [plaintiff then] pressed down on them full force, holding the pressure [and] position for over 1 minute[.]"  Compl. at 124.  Thereafter, defendant Lamoch arrived at the scene and "ordered the plaintiff to be picked upright, which caused intense pain in [plaintiff's] lower back [and] achiles [sic]."  *Id.*  Following this incident, defendant Shue "falsely accused" plaintiff of spitting on defendant Schrader, defendants Schrader and Penree each issued plaintiff false misbehavior reports, and defendants Ross and Lamoch filed "false reports" to corroborate the other reports.  *Id.* at 125.

Thereafter, defendant SORC Ciancio conducted a Tier III disciplinary hearing related to the misbehavior reports authored by defendants Schrader and Penree.  Compl. at 130. After an adjournment, defendant ORC Everson and another ORC official met with plaintiff at his cell and defendant Everson advised plaintiff that a different ORC official was assigned as his "Tier Assistant[,]" but they were present to "help[ ]" this person.  *Id.*  Plaintiff asked defendant Everson for an explanation regarding why his assigned assistant was not present, and why assistance could not wait until this person returned to work.  *Id.* at 130-131.  In response, defendant Everson "raised her voice" and asked plaintiff whether he wanted assistance, to which plaintiff responded that he did.  *Id.* at 131.  Plaintiff then requested the information that he sought.  *Id.*

Defendant Everson told plaintiff that she was not sure how to obtain the information he sought, asked him to sign an assistance form, and subsequently informed defendant Ciancio that plaintiff had "refused assistance."  Compl. at 132.  Thereafter, defendant Ciancio resumed the hearing, denied plaintiff's request on the record for Tier Assistance, and ultimately found him guilty of assaulting defendant Schrader.  *Id.* at 132-134.  Defendant Ciancio imposed a sanction that included 365 days of SHU confinement and loss of good time credits.  *Id.* at 134.  Defendant Ciancio found plaintiff not guilty of the charges in the misbehavior report authored by defendant Penree.  *Id.*  Plaintiff appealed the disciplinary determination and "the sanctions were overturned 4 months later[.]"  *Id.*

On or around January 8, 2025, plaintiff was sent to an outside facility for an MRI even though he had yet to receive the chest x-ray to identify whether a metal object was "stuck inside" him.  Compl. at 135.  Defendants Corrections Officer Bower and Corrections Officer Walker were "the CERT escorts" on this trip.  *Id.*

On April 23, 2025, plaintiff was seen by defendants Czerwinski and Schrader, who refused to prescribe plaintiff a brace for his "visibly swollen knee."  Compl. at 137.  Defendant Slate was also present during the evaluation.  *Id.*

On April 24, 2025, plaintiff told defendant Fischer about defendant Schrader "and his medical staff trying to torture the plaintiff to death [by] withholding meds [and] nutrition" and asked about being transferred to another facility.  Compl. at 138-139.  Defendant Fischer responded that officials were "definitely trying to get rid of [plaintiff]" and walked away without

34

addressing plaintiff's stated concerns.  *Id.* at 139.  The next day, plaintiff spoke with

defendant Christopher and raised the same concerns.  *Id.*  Defendant Christoper "deflected

[and] said, 'will see.'"  *Id.*

On or about June 26, 2025, plaintiff was seen by a Neurologist for a follow-up.  Compl.

at 232.  As of this date, plaintiff "still had not been prescribed recommended meds for pain by

defendant Schrader," or received a follow-up "MRI review[.]"  *Id.*  The Neurologist "told the

plaintiff he would emphasize the need for pain medications to be prescribed as he

recommended . . . [and] the treatment plan as he outlined[,]" but defendant Schrader

"refused."  *Id.*  Defendant Storey was present for plaintiff's follow-up and "ignore[d] the

plaintiff's questions about endocrinology medication[ ] orders [and] other medical records

being withheld[.]"  Compl. at 256.

On July 5, 2025, plaintiff spoke with defendant Czerwinski and asked this official when

he would receive "medications for his glands [and] pain" and an MRI.  Compl. at 233.

Defendant Czerwinski "smiled [and] winked" and said she would "tell Schrader again."  *Id.*

As of July 6, 2025, defendant Schrader had yet to prescribe plaintiff "pain meds [and] meds

for thyroidism, adrenal gland deficiency [and] hypopituitarism" or schedule him for an MRI

follow-up.  *Id.*

### 3. Food Issues

Upon arriving at Mid-State Correctional Facility in July 2022, plaintiff "signed for his gluten free medical diet order[.]"  Compl. at 139.  Nonetheless, plaintiff was delivered meals containing gluten.  *Id.*

On July 20, 2022, plaintiff filed a grievance against defendants Deck and Food Services Cook Bartlett based on these officials "sending [him] food allergens" and omitting "protein portions" from his meals every day for almost two weeks.  Compl. at 139.  Roughly one week earlier, plaintiff wrote to defendant Deck about this matter and this official confirmed that plaintiff "had not been receiving protein daily as entitled" but never corrected the issue.  *Id.* at 139-140.  Instead, plaintiff "continued to receive food allergens [and] cross-contaminated meals" on a daily basis.  *Id.* at 140.

Throughout this time, defendants Matlock, Corrections Officer Stevens, Corrections Officer Gardner, Ross, Corrections Officer Dehli, Corrections Officer Hark, Corrections Officer Martin, Manson, Corrections Officer Nicholas, Corrections Officer Peters, Corrections Officer Ferris, Corrections Officer Ward, Smalls, Mazzone, Corrections Officer Lewis, Lavinski, and Kowalski were "regular feed-up officer[s]" who served plaintiff foods to which he was allergic and "refuse[d] regularly" to contact food services to provide plaintiff with the correct meal.  Compl. at 140-142, 148.  In addition, the following officials were aware during this time that plaintiff was not receiving proper meals, yet failed to address the issue: defendants Area Supervisors Hall, Klein, Carpenter, Fuse, Mayo, Bailey, Chandler, Ferrone, Hamilton, and

36

Lamoch, Administrators Laliberte, Conrad, and Storey, Chaplain Max, Superintendent Passage, Social Workers Cole, Russell, and Kallay, Escort Officers Yaddow and Costello, Counselors Perham, J. Christopher, Klossner, Fish, and Schiavi, Grievance Program Supervisor Tapia, and Nurses Banks and Dana. *Id.* at 143-149.

In addition to raising his concerns with the aforementioned officials, plaintiff filed "countless grievances" against defendants Food Services Administrators Deck, Ardo, C. Zangari, D. Zangari, Galusha, Fear, Ortiz, Bartlett, Townsend, and Noble. Compl. at 146-147. Each of his grievances were denied by defendants Tapia, Hilton, Passage, and Seguin. *Id.* at 147.

In October 2022, plaintiff "returned to his special Kosher gluten free diet with Nazarite Jewish accommodations for no eggs, grapes, [and] vinegar" based on the "non-stop violations" of his medical diet order. Compl. at 149. By this time, plaintiff had been served "well over 150 meals with known allergens[.]" *Id.*

Between November 2022 and June 2023, plaintiff "was deprived of his religious meals according to his truly held beliefs" by defendants Noble, Max, Deck, Ardo, Venetozzi, Conrad, Passage, and Hilton. Compl. at 150. Plaintiff filed "countless grievances" and written requests throughout this time based on being denied Kosher meals. *Id.* In March 2023, plaintiff filled out "the Passover Participation Form" and returned it to defendant Max. *Id.* at 153. Nonetheless, in April 2023, plaintiff was "denied his ability to observe Passover" as a result of restrictions imposed on his meals. *Id.* at 152.

37

On April 9, 2023, plaintiff filed a grievance regarding "continuous denials of Passover participation" and other meal deprivations experienced since October 24, 2022, wherein he named the following officials as having been involved in this wrongdoing: defendants Max, Passage, Conrad, Ardo, Noble, McKoy, Chaudry, Hamilton, Mayo, Klien, Hall, Yaddow, and "all Food Service cooks."  Compl. at 152-153.

In September 2023, during Rosh Hashanah and Yom Kippur, plaintiff was provided multiple meals that either contained foods that violated religious dietary law, foods to which he was allergic, or foods that were spoiled.  Compl. at 161-162.  Plaintiff complained to defendant Max about certain meal issues, but problems continued.  *Id.* at 162.

Plaintiff's diet, which was a "combination diet . . . developed specifically for [him] . . . by defendant Noble . . . did not contain 2,800 calories [and] 90 grams of protein per day, which resulted in insufficient nutrition."  Compl. at 150-151.  In addition, when plaintiff began receiving his Kosher meals, he was "still given allergens[.]"  *Id.* at 154.  As a result, plaintiff eventually "revert[ed] to his medical diet when it was safe to do so, as he tried to work a solution."  *Id.* at 151.

At some point in 2024, plaintiff was "served spoiled food for over 10 days[.]"  Compl. at 157.  Defendants Smalls, Johnson, Ferrone, Hamilton, Chandler, Mazzone, Hamlin, Shue, Hark, Worden, Ward, and Ross "served these meals" and "failed to ensure corrections."  *Id.* During Passover that same year, plaintiff was entirely deprived of adequate nutrition.  *Id.* at 163-164.

### 4. Step-Down Program

The Step-Down Program is "operated" by a Program Management Team ("PMT"), which is "comprised of security, counselors, social workers, and members of the Executive Team (Administration and the Superintendent), and these officials "meet at least twice per week to discuss prisoner [and] program plans" and "progress." Compl. at 166. The following officials are members of the PMT: defendants Passage, Hilton, Burns, Venettozzi, Bishop, Storey, Laliberte, Fischer, Harris, Murphy, J. Christopher, Kallay, Perham, Dorchester, Klossner, Schiavi, Ajukik, Brown, Everson, Hosma, Mayo, Chandler, Ferrone, Hamilton, Klien, and Hall. *Id.* at 167. From the time plaintiff arrived at Mid-State Correctional Facility through 2025, the PMT deprived him of "at least 4 hours of out-of-cell programming every day," in violation of the HALT Act. *Id.* at 167-168. The PMT also deprived plaintiff of other privileges, such as contact visits without restraints and access to packages and certain personal property, in violation of the HALT Act. *Id.* at 168. PMT officials "used negative informational reports" as an "alternative to misbehavior reports[,]" through which sanctions were "relentlessly" imposed against plaintiff without him being afforded a hearing to dispute the alleged wrongdoing. *Id.* at 169.

In or around late September 2022, plaintiff learned that an inmate named "Bradley" with whom he had a negative history had been transferred to Mid-State Correctional Facility. Compl. at 171. Plaintiff informed defendant Perham about the issue and asked to be kept away from this inmate. *Id.* Defendant Perham agreed to raise the issue at the next PMT

meeting, and thereafter informed plaintiff that PMT officials would not separate him from another inmate because "the program is designed to keep [prisoners] with [their] enemies [and] teach [them] how to get along." *Id.* Plaintiff expressed his view that he would not be able to get along with this inmate, and defendant Perham responded that the PMT had "made its decision." *Id.*

Thereafter, PMT officials "decided to put Bradley in the same class with the plaintiff [and] set it up for plaintiff [and] Bradley to sit next to each other[.]" Compl. at 172. In an effort to "repell [sic] any attacks possible" plaintiff "put spoiled milk [and] powder[ed] coffee into a toothpaste [tube] for protection[.]" *Id.*

On October 13, 2022, plaintiff entered a classroom and was initially "shackled [and] handcuffed" to a restraint chair, but his handcuffs were removed before Bradley entered. Compl. at 172-173. Once Bradley entered the room and was seated and shackled to his chair, plaintiff "expelled the spoiled milk in Bradley['s] direction[.]" *Id.* at 173. From outside the classroom, defendants Luther, Kallay, and "several officers" watched plaintiff and Bradley argue, with Bradley spitting on plaintiff. *Id.* Defendant Annarino "cheered Bradley on." *Id.* Plaintiff yelled for security to remove him from the room, but nobody intervened. *Id.* Plaintiff then "threw his boot at Bradley [and] was allowed to attack Bradley" while Bradley was restrained. *Id.*

Following the incident, defendant Mayo escorted plaintiff back to his cell and stated that he "hate[s]" Bradley, while praising plaintiff for his role in the altercation. Compl. at 174.

Thereafter, plaintiff was issued a Tier III misbehavior report.  *Id.*  Defendant J. Christopher, who was "in charge of assigning prisoners to their classrooms [and] put Bradley with the plaintiff," designated herself as plaintiff's hearing officer.  *Id.*

At the conclusion of the disciplinary hearing, defendant Christopher found plaintiff guilty of all charges and imposed sanctions that included 720 days of SHU confinement, loss of all privileges, and six months loss of good time credits.  Compl. at 175.  Thereafter, plaintiff filed a state court Article 78 petition.  *Id.* at 176.  Defendants Passage, Burns, Venettozzi, J. Christopher, Fischer, Conrad, and Rodriguez "all refused to turn over the video footage of the incident[,]" which officials "allowed to play out for no less than 30 minutes without any attempt to enter the classroom."  *Id.*

On February 9, 2024, the state court issued a Decision and Order reversing the SHU sanction and remitting the matter for a rehearing consistent with the provisions of the HALT Act.  Compl. at 176-177.  On March 1, 2024, a rehearing commenced before defendant Hearing Officer Barbosa.  *Id.* at 177.  At the conclusion of the hearing, defendant Barbosa found plaintiff guilty of all charges and sentenced him to 545 days of SHU confinement, along with 4 months loss of good time credits and loss of privileges for 365 days.  *Id.* at 177-178.  Defendant Hilton then undertook a discretionary review of the determination at plaintiff's request and reduced the confinement sanction to 365 days.  *Id.* at 178.

On May 31, 2024, an attorney filed an administrative appeal on plaintiff's behalf, which was submitted to defendant Rodriguez.  Compl. at 178.  On June 18, 2024, defendant

Rodriguez "reviewed [and] affirmed the hearing disposition. *Id.* Counsel then filed a second Article 78 petition. *Id.* Eventually, defendant DOCCS Commissioner Martuscello "expunged the unlawful SHU sanctions" and the Article 78 petition was dismissed as moot. *Id.*

As a result of plaintiff's role in the incident with Bradley on October 13, 2022, defendant J. Christopher "gave orders to PMT staff" and defendant Kallay specifically "to violate plaintiff's attorney/client . . . rights by putting his legal calls on speaker phone for PMT staff to listen in." Compl. at 179. Plaintiff's attorney sent an email to defendant Kallay expressing concerns regarding this practice, which defendant Kallay forwarded to defendant Christopher. *Id.* Defendant Christopher then "fabricated a de facto policy [and] procedure" to justify this conduct. *Id.*

On November 8, 2022, defendants Perham and Kallay placed plaintiff's legal call with his attorney on speaker phone as "PMT staff stood outside the door listening [and] watching plaintiff[.]" Compl. at 180. Defendants Perham and Kallay advised plaintiff that his call was being handled in this matter based on "the new rule . . . from defendant J. Christopher." *Id.* Following this call, plaintiff's attorney again emailed the facility regarding "her concerns." *Id.* Defendant Burns responded to the email "fabricating the de facto policy[.]" *Id.*

Thereafter, plaintiff "had numerous additional legal calls placed on speaker[,]" which were "monitored by PMT staff [and] Kallay." Compl. at 180. Plaintiff verbally notified defendants Passage and Venettozzi about this issue, yet they "did nothing to stop [it.]" *Id.* at

42

181.  Plaintiff also filed grievances against all members of the PMT regarding this matter.  *Id.*
Eventually, "court intervention" ended the "tactic[.]"  *Id.*

From there, PMT officials "moved to another tactic" of "[n]ot allowing plaintiff out for
programs [and] filing false refusals, while keeping plaintiff excessively confined 24/7 for many
months non-stop."  Compl. at 181.  Between 2022 and 2024, defendant Hughes, "an office
assistant for PMT staff," was responsible for filing the majority of these "false refusals[.]"  *Id.*
at 182.  However, defendant Hughes never interacted with plaintiff or made rounds in his
housing area.  *Id.*  The refusals resulted in "false 'negatives'" that plaintiff was unable to
challenge, and for which he received "sanctions" that included a 30-day extension in Phase
One of the Step-Down Program, "phone/education tablet restrictions," loss of food
commissary privileges, and restrictions on programming.  *Id.*

Between "late October/early November 2022 [and] April 17, 2023," and apparently as
a result of the aforementioned "false negatives," plaintiff was denied out-of-cell programming
and group activities with PMT staff.  Compl. at 182.   Throughout this time, "[n]o security PMT
escorts ever [visited] plaintiff's cell for him to attend" and it was therefore impossible for him
to ever refuse attendance.  *Id.*

On April 17, 2023, defendant Christopher "finally agreed to let plaintiff out for
programs."  Compl. at 183.  However, defendant Christopher placed plaintiff in the morning
class, despite the PMT previously agreeing to allow plaintiff to participate in "p.m. classes for
medical reasons[,]" and inmate Bradley being in this class.  *Id.*

43

After plaintiff "made verbal complaints daily to PMT staff on rounds," he was told that defendant Christopher had placed him on a list to meet with PMT staff on April 21, 2023, to "discuss all issues." Compl. at 183. Sometime on the morning of April 21, 2023, plaintiff "secured protection for defense with a soap in a sock for his own safety, knowing the staff set up assaults." *Id.* At some point thereafter, plaintiff "went to meet with PMT[.]" *Id.*

Plaintiff arrived at a "waiting class" where other prisoners were also waiting to meet individually with PMT staff. Compl. at 183. Plaintiff "was secured in [a] restart chair shackled [but] unhandcuffed[.]" *Id.* "As plaintiff was waiting, Bradley was escorted into class" and "seated in the next chair by the plaintiff," at which time he stated, "my turn." *Id.* "Plaintiff then swung the soap in a sock at Bradley twice [and] security intervened." *Id.* at 183-184. Plaintiff believes that PMT officials "forced Bradley onto [him] for retaliatory motives[.]" *Id.* at 184.

Following this incident, plaintiff was issued a misbehavior report by defendant Mayo. Compl. at 184. Defendant Mayo was the official responsible for escorting inmates to PMT meetings and was aware of plaintiff's prior altercation with Bradley. *Id.* at 184-185.

Defendant Storey was assigned as the hearing officer for plaintiff's disciplinary hearing. Compl. at 185. At the conclusion of the hearing, defendant Storey found plaintiff guilty of all charges and sentenced him to six months of SHU confinement. *Id.* Plaintiff appealed the disciplinary determination to defendant Rodriguez, who "affirmed" the decision. *Id.*

As a result of being denied access to programming and receiving the imposed disciplinary sanctions, plaintiff was "not able to progress" through the Step-Down Program and was instead "restricted to Phase One for nearly 2 years, or more" even though "Phase One is only a 6-week stage/phase[.]"  Compl. at 187-188.  Throughout this time, plaintiff did not receive adequate access to "food, clothing, [or] footwear[.]"  *Id.* at 188.

On September 29, 2023, defendant Fischer responded in writing to a complaint made by plaintiff asking this official to review video and audio footage from the Step-Down Program showing that plaintiff was "not being allowed to attend" programming.  Compl. at 189-190. Defendant Fischer "refused to review [the] footage" and responded in writing to plaintiff that he was not allowed to attend afternoon programming based on him "giv[ing] the PMT the impression during rounds that [he is] under the influence of an intoxicant in the afternoons[.]" *Id*. at 190.

On October 1, 2023, beginning at around 3:00 a.m., defendant Corrections Officer Stevenson verbally harassed plaintiff during rounds, calling him racial slurs, "loudly" accusing him of "touch[ing] lil kids" so that other prisoners could hear, making sexual gestures at plaintiff, and kicking his cell door.  Compl. at 193-194.  Plaintiff filed a grievance and "PREA complaint" against defendant Stevenson.  *Id.*  at 194.  Following this incident, other prisoners "began asking the plaintiff about his criminal case[.]"  *Id.*  Defendant Laliberte "denied the PREA complaint" and defendants Tapia, Hilton, and Seguin denied plaintiff's grievance, all refusing to review video footage of the incident.  *Id*.

45

As a result of defendant Stevenson's actions, other prisoners searched public records and learned from a public court filing that plaintiff "spoke to detectives about a homicide case focused on plaintiff being the shooter[.]"  Compl. at 195.  Thereafter, plaintiff was "labeled a snitch" throughout the Step-Down Program.  *Id.*

On December 26, 2023, "a group of gang members [and] their associates conspired to manipulate staff into moving the plaintiff to . . . [a] chaotic [housing area] designated for problematic prisoners" by holding their feed-up hatches open and telling defendants Johnson, Ross, Ferrone, and Dehli that they would not remove their hands until plaintiff is relocated. Compl. at 196-197.  After speaking with these inmates, defendant Johnson stopped at plaintiff's cell with defendant Ross to inform him that he was being relocated and advise him to pack his belongings.  *Id*. at 197.  However, plaintiff "demanded to be left alone" and, after speaking with defendant Ferrone, the move was stopped.  *Id.*

On December 28, 2023, plaintiff returned to his cell from an outside trip to find it "in total chaos[,]" having been searched and ransacked by defendants Johnson and Dehli. Compl. at 197-198.  Plaintiff's legal materials were "clearly read by staff" and some of those materials were "taken or thrown away, along with personal property[.]"  *Id*. at 198.  As plaintiff attempted to "regroup mentally[,]" defendants Johnson and Theo arrived to escort him to a meeting with defendant Chandler.  *Id.* at 199.

Plaintiff met with defendant Chandler in a hearing room, where he was informed that he would be moved to another gallery based on complaints from other inmates.  Compl. at

200.  Thereafter, plaintiff was relocated to cell C1-12, which was filthy and reeked of raw

sewage.  *Id.* at 201.  Plaintiff later learned that the sink in the cell was intentionally clogged by

defendant Ross.  *Id.* at 202.  Plaintiff spent that night in a different cell so that the sink could

be unclogged.  *Id.*

On the morning of December 29, 2023, plaintiff was returned to his new cell, but the

sink was still broken, and the "horrible smell" remained even though defendant "Maintenance

Man Slim alleged he fixed it all."  Compl. at 202.[7]  Plaintiff remained housed in this cell

without access to water until January 8, 2024, when he was "removed for 3 hours while the

sink was worked on."  *Id.*  The sink "remained broken" for roughly another week.  *Id.*

Over the next fourteen months, plaintiff continued to be deprived of out-of-cell

activities.  Compl. at 203-205.

On December 31, 2024, defendant Penree threatened plaintiff with future harm and

broke plaintiff's feed-up hatch.  Compl. at 205.  Defendant Dutcher subsequently retrieved the

feed-up hatch but ignored plaintiff's request to put it back on.  *Id.*

On January 3, 2025, defendants Henry, Ross, Dehli, and Murphy "conspired" to

relocate plaintiff to "a filthy, damaged, cold cell" with a broken shower and clogged heat vent,

that also did not have a working door hatch.  Compl. at 206.  Defendants Christopher,

Lamoch, Chandler, Fuse, and Fann were all shown the damages within this cell, yet "refused

---

[7] On October 27, 2025, the Court received a letter from plaintiff identifying this individual as "Mr. Dutcher."  Dkt. No. 23.

to help." *Id.* at 207.  Plaintiff "was left trapped in [this] filthy, cold, broken cell" until April 2025. *Id.*

"The cell manipulation system was used by PMT against the plaintiff by housing him in filthy, disgusting cells without functional plumbing[,]" and surrounded by cellmates with mental health issues, as a method of retaliation.  Compl. at 210-211.

### 5.  Law Library and Package Issues

Between July 2022 and 2025, plaintiff was deprived of adequate access to the law library and related privileges and services.  Compl. at 212-213.  For example, plaintiff was deprived of a law library tablet for at least two years.  *Id.*  Defendants Passage, Mayo, Klien, Fischer, Hilton, and the other PMT staff members were each involved in these deprivations. *Id.*  Plaintiff's ability to litigate civil matters was "severely hindered" as a result of inadequate law library services.  *Id.* at 215-217.  Plaintiff believes he "lost" two civil cases brought in the New York Court of Claims as a result of "being unable to prepare for trial in 2024[.]"  *Id.* at 219.

On July 25, 2023, defendant Package Room Officer Walhby gave defendant Corrections Officer Schultz a package of books purchased for plaintiff by his family.  Compl. at 219.  Although six books were purchased, plaintiff was only provided with five.  *Id.* Thereafter, defendant Walhby "repeatedly reject[ed]" legal books delivered for plaintiff, tampering with plaintiff's mail in response to his grievances and complaints.  *Id.* at 220-222.

Between May 31 and July 30, 2024, defendant Hamilton destroyed packages mailed to plaintiff containing toothpaste and soap.  Compl. at 223.  Plaintiff was also deprived of other packages by other officials.  *Id.* at 223-225.  Eventually, plaintiff "beg[ged]" defendants Penree, Schrader, Czerwinski, Chaudry, Storey, Hilton, and Christopher to "make medical staff . . . provide treatment [and] Dove soap for visible rashes [and] chemical burns" on plaintiff's body.  *Id.* at 225.  These officials "refused to intervene[.]"  *Id.*

### 6. Mental Health Services

Between 2024 and the summer of 2025, defendant Social Worker Cole "refus[ed] to allow plaintiff access to [out-of-cell] therapy sessions" and "facilitated plaintiff's OMH level being changed from a two up to a level four[.]"  Compl. at 256-257.

Defendants Christopher, Tourtelot, Cole, Czerwinski, Schrader, Chaudry, and Mosher were members of a Joint Case Management Committee ("JCMC"), which met weekly to discuss mental health services provided to inmates, including plaintiff.  Compl. at 257.   The JCMC "targeted" plaintiff's "OMH meds[,]" sometimes changing them and other times stopping them in response to treatment complaints made by plaintiff.  *Id.* at 257-258.

Defendant Office of Mental Health Commissioner Sullivan, along with DOCCS Commissioner Martuscello, former DOCCS Commissioner Annucci, and defendants McCoy, Venettozzi, and Rodriguez, allowed plaintiff to be housed in solitary confinement, despite his mental health needs and the requirements of the HALT Act.  *Id.* at 258-259.  Defendant Sullivan worked with defendants Annucci and Martuscello to narrowly define "serious mental

illness" to "a small number of specific diagnoses" to avoid limitations on restrictive confinement imposed by the HALT Act. *Id.* As a result, plaintiff's "mental health disability diagnoses" did not exclude him from restrictive confinement. *Id.*

Defendants Martuscello and Annucci have also "led DOCCS to continue . . . use of disciplinary confinement in a manner that HALT 'clearly prohibits.'" Compl. at 271. Defendants Hilton and Passage have also failed to implement "necessary reforms" within Mid-State Correctional Facility to comply with the HALT Act, and "restore basic human rights" to plaintiff and others similarly situated. *Id.* at 272.

### 7. "Illegal Strike" Issues

Beginning in February 2025, corrections officials employed at various DOCCS facilities, including several of the named defendants, "began an illegal strike," with their "central demands" being "repeal of HALT [and] increased wages." Compl. at 275-277. As a result of the strike, defendant Martuscello unlawfully suspended unidentified aspects of the HALT Act. *Id.* at 276-278.

On February 23, 2025, plaintiff asked National Guard Officer Nader (not a party) to collect food containers in his cell because they were "stacking up" and "drawing [in] rodents [and] insects[.]" Compl. at 278. Hours later, plaintiff "reminded National Guard members of trash pickup[,]" and in response, defendant National Guard Officer John Doe sprayed the inside of plaintiff's cell "with a pressure washer firehose . . . for several minutes through the feed-up hatch, destroying plaintiff's legal documents, books, clothes, pictures, [and] property."

*Id.* Plaintiff was also sprayed with the water, which "caused him to slip [and] fall [and] injure his knee [and] back." *Id.* at 279.

The destruction of plaintiff's legal materials "has hindered plaintiff['s] civil litigations for other matters[.]" Compl. at 279. As a result of the "illegal strike," plaintiff was also "fed food allergens daily for weeks" and has been forced to remain in segregated confinement "for longer than 17 hours per day." *Id.* at 279-280. Defendant Martuscello's suspension of the HALT Act resulted in plaintiff's loss of daily out-of-cell programming and recreation and "[b]eing denied medications." *Id.* at 280.

The following defendants participated in the "illegal strike": Murphy, Storey, Fischer, Harris, J. Christopher, Laliberte, Tapia, Ardo, Seguin, Noble, Chaudry, Max, Czerwinski, Graveline, Barbosa, SORC Stnaley, Kallay, Tourtelot, Cole, Mosher, Springer, Bartlett, Townsend, Schrader, Penree, Ortiz, Fear, Galusha, C. Zangari, D. Zangari, Ciancio, Surgey, Klossner, Fish, Schiavi, Perham, Luther, Dorchester, Everson, Ajuckik, Hall, Klien, Carpenter, Fuse, Mayo, Bailey, Ferrone, Hamilton, Chandler, Fann, Lamoch, Orcutt, Annarino, Nicholas, Johnson, Ward, Worden, Dehli, Gardner, Hilton, Martuscello, McCoy, Ross, Reddner, Pope, Martin, Mattlock, Hark, Lavinski, Kowalski, Corrections Officer Lewis, Ferris, Peters, Yaddow, Castello, Banks, Shue, Prisma, Smalls, Fabbio, Jacob, Dowsland, Moss, Schultz, Theo, Patek, Gabel, Hughes, Hamlin, Henry, Wahlaby, Mazzone, Walker, Stevens, Stephenson, Bower #1, Bower #2, Rogers, Short, Brown, Hosma, Dundden, and ORC Lewis. Compl. at 289-90.

### 8.  Other Post-Strike Issues

On May 4, 2025, defendant Corrections Sergeant Moss "refused to correct another allergen meal" delivered to plaintiff after he asked her to call Food Services.  Compl. at 236.  In response, plaintiff "threw a milk out of his cell in the opposite direction of Moss."  *Id.* at 237.  Defendant Moss subsequently issued plaintiff a misbehavior report for the incident and a negative informational report.  *Id.*

Defendant Ciancio conducted plaintiff's disciplinary hearing on May 21, 2025.  Compl. at 237.  Plaintiff objected to this official serving in this capacity based on him previously imposing an "unlawful SHU sanction" against plaintiff and denying plaintiff adequate due process when he served as a hearing officer in an earlier disciplinary hearing.  *Id.*  At the conclusion of the hearing, defendant Ciancio imposed an "excessively harsh sentence" that included loss of package, phone, tablet, commissary, and property privileges for 120 days and six months loss of good time credits.  *Id.* at 238-239.

On June 2, 2025, plaintiff spoke with defendant Christopher during rounds and asked for an update related to his medication and "nutritional needs" and reminded her that it had been "over 12 months" since she told him she was "looking into it[.]"  Compl. at 233.  Plaintiff then stated that he was "filing a lawsuit."  *Id.*  Thereafter, defendant Christopher authored "two false reports" charging plaintiff with making threats, a misbehavior report, and a negative informational report, which resulted in PMT staff sanctioning plaintiff with loss of food packages.  *Id.* at 234.  Defendant SORC Stanley also found plaintiff guilty of the charges in

the misbehavior report and sentenced him to 120 days of SHU confinement, 120 days loss of good time credits, and loss of various privileges for 120 days. *Id.*

Defendant Stanley failed to conduct the hearing in a timely manner, denied plaintiff access to an employee assistant and certain video footage, and denied plaintiff the opportunity to question his own witness or be present during that questioning, or call as a witness the officer identified by defendant Christopher as having been present during the events at issue. Compl. at 235. Plaintiff was also not allowed to be present during, and participate in, the hearing. *Id.* at 236. Plaintiff's appeal was pending as of the filing date of this complaint. *Id.*

Liberally construed, the complaint asserts the following claims against the named defendants: (1) First Amendment retaliation claims against defendants Schrader and Penreee based on falsely charging him with wrongdoing in response to his engagement in protected activity ("First Retaliation Claim"); (2) First Amendment retaliation claims against defendants Chandler, Mazzone, Manson, Hamilton, Penree, Surgey, Clapper, and Schrader based on depriving plaintiff of treatment needs in response to his engagement in protected activity ("Second Retaliation Claim"); (3) First Amendment retaliation claims against defendants Chaudry, Czerwinski, Schrader, Dana, Clapper, Candy Hayes, Banks, and Brown based on failing to update plaintiff's medical files in response to his engagement in protected activity ("Third Retaliation Claim"); (4) First Amendment retaliation claims against the PMT members based on listening to plaintiff's calls with his attorney in response to his

engagement in protected activity ("Fourth Retaliation Claim"); (5) First Amendment retaliation claims against the PMT members based on the imposition of "negative informationals" and "false refusals" against plaintiff in response to his engagement in protected activity ("Fifth Retaliation Claim"); (6) First Amendment retaliation claims against the PMT members based on the "cell manipulation system" imposed against plaintiff in response to his engagement in protected activity ("Sixth Retaliation Claim"); (7) First Amendment retaliation claims against defendants Walhby and Hamilton based on depriving plaintiff of access to packages in response to his engagement in protected activity ("Seventh Retaliation Claim"); (8) First Amendment retaliation claims against the JCMC members based on depriving plaintiff of access to adequate mental health treatment in response to his engagement in protected activity ("Eighth Retaliation Claim"); (9) a First Amendment retaliation claim against defendant Christopher based on issuing plaintiff "false reports" on June 2, 2025 in response to his engagement in protected activity ("Ninth Retaliation Claim"); (10) First Amendment access-to-courts claims against the PMT members based on plaintiff's lack of access to the law library and legal services; (11) First Amendment mail tampering claims against defendants Walhby and Hamilton based on depriving plaintiff of access to packages; (12) First Amendment free exercise claims against defendants Mohammed, Abdelwahab, Noble, Max, Deck, Ardo, Venetozzi, Conrad, Passage, Hilton, McKoy, Chaudry, Hamilton, Mayo, Klien, Hall, Yaddow, and Tapia based on depriving plaintiff of access to religious meals; (13) a Fourth Amendment unlawful cell search claim against defendants Johnson and Deli based on the events of

December 28, 2023; (14) Fourth Amendment privacy claims against the PMT members based on preventing plaintiff from having private communications with his attorney; (15) Eighth Amendment excessive force claims against defendants Ross and Hamilton based on the events of July 2, 2024 ("First Excessive Force Claim"); (16) Eighth Amendment excessive force and failure-to-intervene claims against defendants Patek, Gabel, and Corrections Officers John Doe #1-5 based on the events of December 8, 2024 ("Second Excessive Force Claim"); (17) Eighth Amendment excessive force and failure-to-intervene claims against defendants Shue, Penree, Schrader, Ross, and Lamoch based on the events of January 2, 2025 ("Third Excessive Force Claim"); (18) Eighth Amendment medical indifference claims against defendants Czerwinski, Aiken, Schrader, Chaudry, Kallay, Dana, Surgey, Jennifer Christopher, Candy Hayes, Christopher Hayes, Hoffman, LaCoppola, Nurse Jane Doe, Russell, Paladino, Dana, Hilton, Fischer, Harris, Storey, Fish, Kallay, Dorchester, Perham, Czerwinski, Schrader, Penree, Chaudry, Clapper, Abdelwahab, Schiavi, Tourtelot, Costello, Yaddow, Ross, Hall, Klien, Mayo, Chandler, Hamilton, Dundden, Johnson, Carpenter, Bishop, Rosario, Murphy, and Tapia based on interference with medical visits ("First Medical Indifference Claim"); (19) Eighth Amendment medical indifference claims against defendants Brown, Paladino, Czerwinski, Tapia, and Hilton based on failing to update plaintiff's medical proxy ("Second Medical Indifference Claim"); (20) Eighth Amendment medical indifference claims against defendants Chaudry, Czerwinski, Schrader, Dana, Clapper, Candy Hayes, Banks, and Brown based on failing to update plaintiff's medical files ("Third Medical

Indifference Claim"); (21) Eighth Amendment medical indifference claims against defendants Chaudry, Czerwinski, Schrader, J. Christopher, Storey, Mosher, Mohammed, Abdelwahab, Hilton, Bishop, Fischer, Harris, Lileberte, Penree, Aiken, Ferrone, Hamilton, Prisma, Walker, Johnson, Russell, Reddner, Slate, Hark, Christopher Hayes, Candy Hayes, Chandler, Mazzone, Manson, Surgey, Clapper, and Tourtelot based on failing to adequately address plaintiff's medical needs ("Fourth Medical Indifference Claim"); (22) Eighth Amendment medical indifference claims against defendants Tourtelot, Schrader, Penree, Ferrone, Nurse Jane Doe #1, Nurse Jane Doe #2 based on failing to adequately address plaintiff's seizures ("Fifth Medical Indifference Claim"); (23) Eighth Amendment medical indifference claims against defendants Smalls, Costello, Tourtelot, Ferrone, Ross, Hamilton, and Penree based on the events of July 2, 2024 ("Sixth Medical Indifference Claim"); (24) Eighth Amendment medical indifference claims against defendants Hark, Hamilton, Penree, CERT Female, and Edick based on failing to document plaintiff's injuries from a slip-and-fall incident in October 2024 ("Seventh Medical Indifference Claim"); (25) Eighth Amendment medical indifference claims against defendants Ferrone, Henry, Walker, McGraw, Shue, Patek, Gabel, Corrections Lieutenant John Doe, Penree, Brown, and Surgey based on placing plaintiff in an OBS cell and depriving him of access to adequate care in December 2024 ("Eighth Medical Indifference Claim"); (26) Eighth Amendment medical indifference claims against the JCMC members based on depriving plaintiff of access to adequate mental health treatment ("Ninth Medical Indifference Claim"); (27) Eighth Amendment medical indifference claims against

defendants Sullivan, Martuscello, Annucci, McCoy, Venettozzi, and Rodriguez based on placing plaintiff in restrictive confinement despite his mental health needs ("Tenth Medical Indifference Claim"); (28) Eighth Amendment medical indifference claims against defendants Deck, Matlock, Stevens, Gardner, Ross, Dehli, Hark, Martin, Manson, Nicholas, Peters, Ferris, Ward, Smalls, Mazzone, Corrections Officer Lewis, Lavinski, Kowalski, Area Supervisors Hall, Klein, Carpenter, Fuse, Mayo, Bailey, Chandler, Ferrone, Hamilton, Lamoch, Administrators Laliberte, Conrad, Storey, Chaplain Max, Superintendent Passage, Social Workers Cole, Russell, Kallay, Yaddow, Costello, Perham, J. Christopher, Klossner, Fish, Schiavi, Tapia, Nurses Banks and Dana, Ardo, C. Zangari, D. Zangari, Galusha, Fear, Ortiz, Bartlett, Townsend, Noble, Hilton, Moss, Passage, and Seguin based on depriving plaintiff of his medical diet ("Eleventh Medical Indifference Claim"); (29) Eighth Amendment failure-to-protect claims against defendants Christopher, Hilton, Bishop, Storey, Fischer, Harris, Laliberte, Chaudry, Czerwinski, Schrader, Penree, Ferrone, Prisma, Hark, Johnson, Hamilton, and Russell based on failing to provide plaintiff with a shower curtain ("First Failure-to-Protect Claim"); (30) Eighth Amendment failure-to-protect claims against the PMT members and defendants Luther and Annarino based on failing to separate plaintiff and inmate Bradley ("Second Failure-to-Protect Claim"); (31) Eighth Amendment harassment and failure-to-protect claims against defendants Stevenson, Laliberte, Tapia, Hilton, and Seguin based on the events of October 1, 2023 ("Third Failure-to-Protect Claim"); (32) Eighth Amendment failure-to-protect claims against various defendants for participating in a labor

strike ("Fourth Failure-to-Protect Claim"); (33) Eighth Amendment conditions-of-confinement

claims against defendants Hilton, Passage, and the PMT members based on maintaining

plaintiff in the Step-Down Program for over three years and restricting out-of-cell

programming ("First Conditions-of-Confinement Claim"); (34) Eighth Amendment conditions-

of-confinement claims against defendants Smalls, Johnson, Ferrone, Hamilton, Chandler,

Mazzone, Hamlin, Shue, Hark, Worden, Ward, and Ross based on serving plaintiff spoiled

meals ("Second Conditions-of-Confinement Claim"); (35) Eighth Amendment conditions-of-

confinement claims against defendants J. Christopher and Fischer based on denying plaintiff

access to out-of-cell programming ("Third Conditions-of-Confinement Claim"); (36) Eighth

Amendment conditions-of-confinement claims against defendants Patek, Gabel, Penree,

Patek, Gabel, Hamlin, Rogers, Short, Henry, Corrections Officers John Doe #1-5, John Doe

Short Guy and John Doe Tall Guy based on plaintiff's OBS cell conditions ("Fourth

Conditions-of-Confinement Claim"); (37) Eighth Amendment conditions-of-confinement claims

against defendants Chandler, Ross, Henry, Dehli, Murphy, Christopher, Lamoch, Fuse, Fann,

and Dutcher based on plaintiff's cell conditions between late December 2024 and early

January 2025 ("Fifth Conditions-of-Confinement Claim"); (38) an Eighth Amendment

conditions-of-confinement claim against defendant National Guard Officer John Doe based

on the events of February 23, 2025 ("Sixth Conditions-of-Confinement Claim"); (39) an Eighth

Amendment conditions-of-confinement claim against defendant Martuscello based on his

suspension of certain out-of-cell privileges during the labor strike ("Seventh Conditions-of-

Confinement Claim"); (40) Fourteenth Amendment disciplinary due process claims against defendants Passage, Burns, Venettozzi, J. Christopher, Fischer, Conrad, Rodriguez, Barbosa, and Hilton arising out of the events of October 13, 2022, and related disciplinary hearing ("First Disciplinary Due Process Claim"); (41) Fourteenth Amendment disciplinary due process claims against defendants Mayo, Storey, and Rodriguez arising out of the April 2023 incident involving defendant Bradley and the related disciplinary hearing ("Second Disciplinary Due Process Claim"); (42) Fourteenth Amendment disciplinary due process claim against defendants Laliberte, Rodriguez, and ORC Lewis arising out of plaintiff's disciplinary hearing in December 2024 ("Third Disciplinary Due Process Claim"); (43) Fourteenth Amendment disciplinary due process claims against defendants Ciancio, Everson, Shue, Schrader, Penree, Ross and Lamoch arising out of the events of January 2, 2025, and the related disciplinary hearing ("Fourth Disciplinary Due Process Claim"); (44) Fourteenth Amendment disciplinary due process claims against defendants Moss and Ciancio arising out of the events of May 4, 2025, and the related disciplinary hearing ("Fifth Disciplinary Due Process Claim"); (45) Fourteenth Amendment disciplinary due process claims against defendants Christopher and Stanley arising out of the events of June 2, 2025, and the related disciplinary hearing ("Sixth Disciplinary Due Process Claim"); (46) Fourteenth Amendment due process claims against defendants Ferrone, Henry, Walker, McGraw, Shue, Patek, Gabel, and Corrections Lieutenant John Doe based on placing plaintiff in an OBS cell in December 2024 without a hearing; (47) Fourteenth Amendment due process claims against

59

the PMT members and defendant Hughes based on the imposition of "negative informationals" and "false refusals" that resulted in the denial of privileges without a hearing; (48) Fourteenth Amendment destruction of property claims against defendants Johnson and Deli based on the events of December 28, 2023; (49) Fourteenth Amendment destruction of property claims against defendants Walhby, Schultz, and Hamilton based on depriving plaintiff of access to packages; (50) Fourteenth Amendment medical privacy claims against defendants Mohammed, Ferguson, and Schrader; (51) Fourteenth Amendment due process claims against defendants Tapia, Seguin, Passage, and Hilton based on denying plaintiff access to grievance channels; (52) a claim against defendants Mohammed, Ferguson, and Schrader for violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), Pub.L. No. 104-191, 110 Stat.1936 (1996); and (53) state law claims against defendants Annucci, Martuscello, McCoy, Rodriguez, Venettozzi, Hilton, Passage, and Sullivan based on violation of the HALT Act.

Plaintiff seeks money damages and injunctive relief.  Compl. at 357-60.  For a more complete statement of plaintiff's claims, reference is made to the complaint.

### C.    Analysis

Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for "'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States."  *German v. Fed. Home Loan Mortg. Corp*., 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting

42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz*, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)).  "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'"  *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

If a defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct.  *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has

violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting

*Iqbal*, 556 U.S. at 676 and holding that "there is no special rule for supervisory liability").

### 1.  Retaliation Claims

Courts must approach claims of retaliation "'with skepticism and particular care'

because 'virtually any adverse action taken against a prisoner by a prison official–even those

otherwise not rising to the level of a constitutional violation–can be characterized as a

constitutionally proscribed retaliatory act.'"  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)

(quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*,

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).  To state a plausible claim, a plaintiff

asserting a First Amendment retaliation claim must advance "non-conclusory" allegations

establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant

took adverse action against the plaintiff, and (3) that there was a causal connection between

the protected speech [or conduct] and the adverse action."  *Davis*, 320 F.3d at 352 (quoting

*Dawes*, 239 F.3d at 492).  "[A] complaint which alleges retaliation in wholly conclusory terms

may safely be dismissed on the pleadings alone."  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d

Cir. 1983).

"To be an 'adverse action,' retaliatory conduct must be the type that would deter 'a

similarly situated individual of ordinary firmness from exercising his or her constitutional

rights.'"  *Hayes v. Dahlke*, 976 F.3d 259, 274 (2d Cir. 2020) (quoting *Davis*, 320 F.3d at 353)).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro

62

se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that each of plaintiff's retaliation claims survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 2. Access-to-Courts Claims

In *Bounds v. Smith*, the Supreme Court held that access to the courts is a fundamental right that requires prison authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. 817, 828 (1977).

The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds*, 430 U.S. at 828, *modified on other grounds*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004). "However, this right is not 'an abstract, freestanding right . . . .' and cannot ground a Section 1983 claim without a showing of 'actual injury.'" *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that (1) the defendant acted deliberately, and (2) the plaintiff suffered an actual injury. *Lewis*, 518 U.S. at 353; *Konigsberg v. Lefevre*, 267 F.

Supp. 2d 255, 261 (N.D.N.Y. 2003) ("Prison officials may only be held liable for such injury if they frustrated or impeded a prisoner's efforts to pursue a non-frivolous legal claim.").

"A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). Instead, a plaintiff must demonstrate "actual injury" by establishing that the denial "hindered his efforts" to pursue a non-frivolous legal claim. *Lewis*, 518 U.S. at 349, 351-53 (noting that "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense").

The Supreme Court has stated that in order to allege a denial of access to the courts claim, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint . . . ." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The underlying claim "must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id*. at 415-16. "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id*. at 417-18 (footnote omitted).

"Finally, . . . the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. Rather, the injury must be to an inmate's ability "to attack [his] sentence[ ], directly or collaterally, [or] . . . to challenge the conditions of [his]

confinement." *Id*. at 355.  "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id*.

In this case, plaintiff alleges that the PMT members deprived him of access to the law library and legal services, which "severely hindered" his ability to litigate civil matters.  *See* Compl. at 212-217.  Plaintiff also alleges that he believes he "lost" two civil cases brought in the New York Court of Claims as a result of "being unable to prepare for trial in 2024[.]"  *Id*. at 219.

As an initial matter, the complaint does not include any details regarding the nature of plaintiff's existing or intended lawsuits, let alone allegations from which the Court may be able to infer that the "arguable" nature of these actions was "more than hope."  *Christopher*, 536 U.S. at 415-16.  Moreover, the complaint does not explain in any detail how plaintiff believes that a lack of access to law library services impacted any of his proceedings, i.e., what legal issue or filing necessitated law library services in each proceeding.  Thus, the Court has no basis to plausibly infer from the allegations in the complaint and documents attached thereto that plaintiff suffered an "actual injury" in any court proceeding as a result of the lack of access to law library services.

Accordingly, plaintiff's access-to-courts claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

65

### 3. Mail Tampering Claims

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). A prisoner's mail may only be restricted to further "'one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Id.* (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351. "While a prisoner has a right to be present when his legal mail is opened, . . . an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

66

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's mail tampering claims survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 4.  Free Exercise Claims

The First Amendment to the United States Constitution guarantees the right to free exercise of religion.  *See* U.S. Const. amend. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).  As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors.  *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

"[A]n inmate does not need to establish a substantial burden in order to prevail on a free exercise claim under § 1983."  *Kravitz v. Purcell*, 87 F.4th 111, 125 (2d Cir. 2023).  "In the prison context, however, 'the right to free exercise of religion' is balanced against 'the interests of prison officials charged with complex duties arising from administration of the penal system.'"  *Kravitz*, 87 F.4th at 127-28 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)).  Thus, "an infringement of the free exercise of religion [may be] permissible . .

. if it is 'reasonably related to legitimate penological interests.'" *Id*. (quoting *Benjamin*, 905 F.2d at 574).

"[T]o assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers legitimate penological objectives." *Kravitz*, 87 F.4th at 128 (alterations adopted) (quoting *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's free exercise claims survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 5. Unlawful Cell Search Claim

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. A seizure of property "occurs when there is some meaningful interference with an individual's possessory interest in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The Supreme Court has held that "the Fourth Amendment has no applicability to a prison cell" or the unlawful destruction of property when adequate post-deprivation

remedies exist.  *Hudson v. Palmer*, 468 U.S. 517, 528 n.8, 536 (1984); *see also Vogelfang v. Capra*, 889 F. Supp. 2d 489, 509 (S.D.N.Y. 2012) (dismissing Fourth Amendment claim based on unlawful confiscation of property because adequate state post-deprivation remedies were available).

In this case, plaintiff alleges that on December 28, 2023, defendants Johnson and Dehli ransacked his cell during a search while he was away, and confiscated or discarded some of his legal materials, along with personal property.  Compl. at 197-198.

Importantly, plaintiff does not allege that he was unable to litigate any pending or intended claim in a court proceeding as a result of this wrongdoing.  Nor does plaintiff allege that adequate post-deprivation remedies were unavailable to him insofar as any item of property was not returned to him.[8]  Thus, plaintiff cannot succeed on a Fourth Amendment claim based on the alleged confiscation of property from his cell.  *See Hudson*, 468 U.S. at 539 ("Since the exigencies of prison life authorize officials indefinitely to dispossess inmates of their possessions without specific reason, any losses that occur while the property is in official custody are simply not redressable by Fourth Amendment litigation."); *Soldal v. Cook County*, 506 U.S. 56, 65 (1992) ("[A]n inmate, because of his status, enjoy[s] neither a right to privacy in his cell nor protection against unreasonable seizures of his personal effects");

---

[8] As the Second Circuit has made clear, "New York in fact affords an adequate post-deprivation remedy" for inmates seeking to recover monetarily for lost or destroyed property "in the form of, inter alia, a Court of Claims action."  *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001); *Davis v. New York*, 311 Fed. App'x 397, 400 (2d Cir. 2009) ("The existence of this adequate post-deprivation state remedy would thus preclude [plaintiff's] due process claim under § 1983 [for lost personal property].").

*Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) ("[T]he Court properly concluded that the confiscation of Koehl's eye-glasses did not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies." (internal citations omitted)); *Humphrey v. Sec'y Pennsylvania Dep't of Corr.*, 712 Fed. App'x 122, 125 (3d Cir. 2017) ("We agree with the District Court that, to the extent Humphrey claimed that the seizure of his legal materials was a violation of the Fourth Amendment, he failed to state a claim for relief because the Fourth Amendment has no applicability to the contents of a prisoner's cell. . . . In addition, because he has an adequate post-deprivation remedy, both through the prison grievance process and in state tort law, any alleged due process claims with respect to the confiscation of his legal materials also fail." (internal citations omitted)).

Accordingly, plaintiff's unlawful cell search claim is dismissed without prejudice pursuant to 28 U.S.C. 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 6. Privacy Claim

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. "The protection afforded by the Fourth Amendment against unreasonable searches and seizures 'governs not only the seizure of tangible items, but extends as well to the recording of oral statements.'" *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 433 (E.D.N.Y. 2006) (quoting

*Katz v. United States*, 389 U.S. 347, 353 (1967)).  As noted in *Katz*, the applicability of the Fourth Amendment depends on two things: "first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'"  *Id*. at 361 (Harlan, J., concurring).  "If those prerequisites are met, then the court must determine whether the search or seizure at issue was reasonable."  *Lonegan*, 436 F. Supp. 2d at 433.  "In the context of electronic surveillance, a search and seizure is presumed to be unreasonable unless authorized in advance by a warrant.  *Id*. (citing *Katz*, 389 U.S. at 359).

It is well-settled that the attorney-client privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure."  *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888).  "[W]hile a prison is not, for most purposes, a place where a person expects privacy, privileged communications between attorneys and clients, the recording of which is prohibited both by statute and regulation, . . . are protected by the Fourth Amendment from government eavesdropping, especially when those communications take place in the area of the prison designated for attorney-client meetings."  *Lonegan*, 436 F. Supp. 2d at 435 (E.D.N.Y. 2006) (collecting cases).

In light of the foregoing, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's Fourth

71

Amendment privacy claims survive sua sponte review and require a response.  In so ruling,

the Court expresses no opinion as to whether these claims can withstand a properly filed

dispositive motion.

### 7.  Excessive Force and Failure-to-Intervene Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the

hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*,

429 U.S. 97, 104 (1976).  This includes punishments that "involve the unnecessary and

wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  The Second Circuit,

in addressing the needs protected by the Eighth Amendment, has stated that sentenced

prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and

personal safety."  *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*

*sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir.

1981).

The Eighth Amendment's prohibition against cruel and unusual punishment

encompasses the use of excessive force against an inmate, who must prove two

components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2)

objectively, that the defendant's actions violated "contemporary standards of decency."

*Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing

*Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs*., 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Law enforcement officials, including prison officials, can be held liable under Section 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that each of plaintiff's excessive force and failure-to-intervene claims survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 8. Eighth Amendment Medical Indifference Claims

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle*, 429 U.S. at 102, 104. The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is

incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.*; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citing, *inter alia*, *Estelle*). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer*, 511 U.S. at 832 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104).

"First, the alleged deprivation must be, in objective terms, sufficiently serious."  *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted).  Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  To determine whether inadequate care is "sufficiently serious," a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). "Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on 'the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract.'"  *Revels v. Corr. Med. Care, Inc.*, No. 9:17-CV-

74

0088 (MAD/TWD), 2018 WL 1578157, at *4 (N.D.N.Y. Mar. 28, 2018) (quoting *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003)); *see also Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329722, *8 (S.D.N.Y. Sept. 27, 2017) (finding that where a "plaintiff suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay").

"Second, the defendant must act with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'").

Non-medical personnel may be held liable for deliberate indifference to medical needs where a plaintiff demonstrates that the prison personnel intentionally denied or delayed access to medical care or intentionally interfered with medical treatment once it was prescribed. *See Banks v. No. 8932 Corr. Officer*, No. 11-CV-8359, 2013 WL 673883, at *4 (S.D.N.Y. Feb. 25, 2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was prescribed."); *see also Estelle*, 429 U.S. at 104-

75

05 (1976) (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that all but the following medical indifference claims survive sua sponte review and require a response: (1) the First Medical Indifference Claim insofar as it is asserted against defendant Rosario; (2) the Second Medical Indifference Claim; (3) the Fifth Medical Indifference Claim insofar as it is asserted against Nurse Jane Doe #1 and Nurse Jane Doe #2; and (4) the Seventh Medical Indifference Claim. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

Insofar as the complaint asserts a medical indifference claim against defendant Rosario based on a single missed medical trip on August 7, 2023, by plaintiff's own allegations, this official arrived at plaintiff's cell to transport him for the trip, and plaintiff "requested to speak with a supervisor" to ensure that his trip would proceed. Compl. at 57-58. While plaintiff also alleges that nobody ever returned to speak with him, the Court has no basis to plausibly infer that defendant Rosario either (1) was aware of the medical significance of the trip, or (2) interfered with plaintiff's ability to attend the trip. Thus, plaintiff has failed to adequately plead a claim for medical indifference against this official.

Insofar as the complaint asserts a medical indifference claim against defendants Brown, Paladino, Czerwinski, Tapia, and Hilton based on allegations that these officials failed

to update plaintiff's medical proxy, plaintiff does not allege that the failure to update his medical proxy resulted in the denial of any medical treatment, or otherwise exposed him to an objectively serious risk of harm.  Thus, while this conduct may be evidence of deliberate indifference that is generally relevant to other underlying claims, it does not give rise to an independent Eighth Amendment claim.

Insofar as the complaint asserts a medical indifference claim against defendant Nurse Jane Doe #1 based on allegations that this official failed to treat plaintiff at his cell after he had "another seizure" on June 26, 2024, and against defendant Nurse Jane Doe #2 based on allegations that this official failed to examine plaintiff after a separate seizure around the same time, by plaintiff's own allegations, he frequently suffered from seizures in 2024. Moreover, the complaint does not allege (1) the type of post-seizure treatment plaintiff normally received or expected, (2) how any sort of treatment may have improved plaintiff's condition, (3) when plaintiff received treatment following either of these seizures, (4) the nature of the treatment that he received, (5) how plaintiff's condition worsened, if at all, based on Nurse Jane Doe #1 and Nurse Jane Doe #2 not providing any treatment, or (6) what these officials communicated to plaintiff during their visits with him, if anything.  Thus, the Court has no basis to plausibly infer either that (1) plaintiff was suffering from an objectively serious medical condition when either Nurse Jane Doe #1 or Nurse Jane Doe #2 visited him at his cell, or (2) the failure by either of these officials to treat plaintiff to his satisfaction was based on deliberate indifference to his well-being.

77

Finally, insofar as the complaint asserts a medical indifference claim against defendants Hark, Hamilton, Penree, CERT Female, and Edick based on these officials failing to document plaintiff's injuries from a slip-and-fall incident in October 2024, and arrange for brain imaging, the complaint acknowledges that defendant Hamilton documented plaintiff's head injuries at defendant Penree's direction.  *See* Compl. at 95-96.  Moreover, the complaint is devoid of allegations which plausibly suggest that the failure to document plaintiff's injuries to his satisfaction prevented him from obtaining additional necessary medical treatment for those injuries, or that plaintiff's condition worsened in some respect as a result of not having other injuries documented.  Furthermore, the law is well-settled that a prisoner is not entitled to the treatment of his choosing, and the failure to document an incident after-the-fact does not, without more, give rise to an Eighth Amendment claim.  *See, e.g., Cox v. Lescano*, No. 20-CV-7381, 2022 WL 2048106, at *8 (S.D.N.Y. June 7, 2022) ("Plaintiff alleges Defendant Lescano examined the depigmentation on his scalp but 'intentionally refused to note down that she viewed Cox's scalp with a light and magnified class' and 'did not even make mention of exam performed on October 8, 2018.' . . . Plaintiff does not allege how the alleged false record occurred in connection with any deliberate indifference of Lescano to his medical needs."); *Evans v. Murphy*, No. 12-CV-365, 2013 WL 2250709, at *3 (W.D.N.Y. May 22, 2013) (dismissing claim that defendant "failed  to document [plaintiff's] injuries to cover-up the incident[,]" noting that "[s]uch a claim does not state a constitutional claim"); *Bloomfield v. Wurzberger*, No. 9:08-CV-0619 (GLS/RFT), 2009 WL 3335892, at *5 (N.D.N.Y. Oct. 15,

78

2009) (filing of a false entry in an inmate's medical records, without more, does not constitute a constitutional violation); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *Wright v. Genovese*, 694 F. Supp. 2d 137, 155 (N.D.N.Y. 2010) ("An inmate does not have the right to treatment of his choice. The fact that the plaintiff might have preferred an alternative treatment ... does not rise to the level of a constitutional violation." (citation omitted)).

In light of the foregoing, the Second Medical Indifference Claim, Seventh Medical Indifference Claim, and plaintiff's Eighth Amendment medical indifference claims against defendants Rosario, Nurse Jane Doe #1, and Nurse Jane Doe #2 are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 9. Failure-to-Protect Claims

Prison officials may separately be held liable under Section 1983 for failing to protect an inmate from conditions posing a substantial risk of serious harm. *See Farmer*, 511 U.S. at 836. In order to establish a "failure to protect," the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer*, 511 U.S. at 836. Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the

79

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

"One way to make out such a claim is to allege that 'a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official being sued had been exposed to information concerning the risk and thus must have known about it.'" *Coronado v. Goord*, No. 99-CV-1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (quoting *Farmer*, 511 U.S. at 842-43); *see also Hayes*, 84 F.3d at 620-21 (prisoner's repeated expressions of fear following an inmate attack and requests for transfer as a safety measure raised a question of fact). "Courts have [also] found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted." *Davis v. Torres*, No. 10-CV-2236, 2012 WL 3070092, at *5 (S.D.N.Y. May 2, 2012), *report and recommendation adopted by* 2012 WL 3070083 (S.D.N.Y. July 27, 2012); *see also Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment where plaintiff presented evidence that he informed sergeant of correction officers' threatening behavior and was later assaulted by those officers).

"On the other hand, an inmate's communications about 'generalized safety concerns' or 'vague concerns of future assault by unknown individuals' are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm." *Stephens v.*

80

*Venettozzi*, No. 13-CV-5779, 2016 WL 929268, at *19 (S.D.N.Y. Feb. 24, 2016) (quoting *Ross v. City of New York*, No. 12-CV-8545, 2014 WL 3844783, at *8 (S.D.N.Y. 2014), *rev'd on other grounds*, No. 14-3327 (2d Cir. July 20, 2015) (summary order)), *report and recommendation adopted sub nom. Stephens v. Venettozzi*, 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's Second Failure-to-Protect Claim and Third Failure-to-Protect Claim against defendant Stevenson survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

With respect to the First Failure-to-Protect Claim, the complaint alleges that defendants Christopher, Hilton, Bishop, Storey, Fischer, Harris, Laliberte, Chaudry, Czerwinski, Schrader, Penree, Ferrone, Prisma, Hark, Johnson, Hamilton, and Russell failed to provide plaintiff with a shower curtain despite his requests prior to a slip and fall incident on October 5, 2024.  Compl. at 92-94.  Importantly, the complaint does not include any details which plausibly suggest that plaintiff specifically advised any of these officials about a risk of harm as a result of not having access to a shower curtain in advance of October 5, 2024.  Furthermore, by plaintiff's own allegations, he was aware of the wet floor condition before exiting the shower, and the complaint does not allege that plaintiff was unable to exercise self-precautions on this particular day, such as covering the water with a sheet or towel, sidestepping it, or requesting assistance upon seeing it.  In other words, the Court has no

81

basis to plausibly infer either that (1) plaintiff was exposed to an objectively serious risk of harm on October 5, 2024, or (2) defendants Christopher, Hilton, Bishop, Storey, Fischer, Harris, Laliberte, Chaudry, Czerwinski, Schrader, Penree, Ferrone, Prisma, Hark, Johnson, Hamilton, or Russell knew or should have know that not providing plaintiff was a shower curtain exposed him to an objectively serious risk of harm on this date.  *See McCray v. Lee*, No. 16-CV-1730, 2018 WL 1620976, at *7-9 (S.D.N.Y. Mar. 29, 2018) (concluding that a recreation area not entirely covered with ice did not present an objectively serious environment, and allegations that an official directed plaintiff into the recreation area where he slipped and fell on ice suggested, at most, negligence), *aff'd in pertinent part*, 963 F.3d 110 (2d Cir. 2020) (affirming "dismissal of so much of the [SAC] as seeks relief on the basis that the combination of the slippery conditions in the recreation yards and Kutz's order that McCray go into the yard on February 20, 2014 violated McCray's rights under the Eighth Amendment"); *Korotkova v. United States*, 990 F. Supp. 2d 324, 330 (E.D.N.Y. 2014) ("[I]n prisons—where the conditions of confinement are not voluntary or recreational ...—courts have found that 'slip-and-fall plaintiffs' do not state a cognizable claim under the Eighth Amendment."); *Fredricks v. City of New York*, No. 12-CV-3734, 2014 WL 3875181, at *4 (S.D.N.Y. July 23, 2014) ("A prisoner's bare complaint about a slippery floor, without more, does not state an arguable claim of deliberate indifference."); *Martin v. City of New York*, No. 11-CV-600, 2012 WL 1392648, at *9 (S.D.N.Y. Apr. 20, 2012) (dismissing complaint that alleged that the plaintiff slipped and fell on a wet floor while wearing ill-fitting shoes); *Garland*

*v. City of New York*, No. 22-CV-10947, 2023 WL 2898625, at *3 (S.D.N.Y. Apr. 10, 2023) ("Plaintiff does not allege any facts as to the October 3, 2014, fall, or as to the May 5, 2015, shower scalding, showing that any correction official was deliberately indifferent to a risk of serious harm to Plaintiff."); *Heredia v. Doe*, 473 F. Supp. 2d 462, 463 (S.D.N.Y. 2007) (dismissing a § 1983 claim based on an allegation that the plaintiff "slipped and fell while walking to his cell" because "the pleadings fail to state facts which constitute anything more than a claim for negligence, for which there is no cause of action under ... § 1983").

With respect to the Third Failure-to-Protect Claim, the complaint alleges that defendant Stevenson verbally harassed plaintiff on October 1, 2023, suggesting in the presence of other inmates that plaintiff was incarcerated for being a sex offender, and defendants Laliberte, Tapia, Hilton, and Seguin subsequently failed to take corrective steps with respect to plaintiff's sexual harassment complaint.  *See* Compl. at 193-194.

Insofar as plaintiff asserts claims against defendants Laliberte, Tapia, Hilton, and Seguin, the Court has no basis to plausibly infer from the allegations in the complaint that plaintiff faced any ongoing risk of serious harm as a result of defendant Stevenson's actions on October 1, 2023, let alone any ongoing risk that was made known to Laliberte, Tapia, Hilton, and Seguin through plaintiff's complaints.  Rather, the allegations in the complaint suggest that plaintiff complained to these officials only about a past incident of harm.  Thus, the alleged failure to address the wrongdoing after-the-fact does not amount to an Eighth Amendment violation.  *See, e.g., Boyd v. Doe #1*, No. 9:18-CV-1333 (TJM/ATB), 2021 WL

7542409, at *16 (N.D.N.Y. Nov. 30, 2021) (citations omitted) ("[T]he crux of [the] plaintiff's

claims against [the defendants] is that they are liable for failing to sufficiently remedy the

wrongs of their subordinates, despite having received notice from [the] plaintiff of the alleged

misconduct. These contentions closely track the pre-*Tangreti* standard for establishing

personal involvement of a supervisory official; contemplating personal involvement where an

official, after being informed of the violation through report or appeal, failed to remedy the

wrong. However, in the wake of *Tangreti* these allegations are insufficient to establish

personal involvement of a supervisory official, and plaintiff has otherwise failed to allege facts

plausibly suggesting [the defendants'] personal involvement in the alleged conduct giving rise

to [the] plaintiff's First and Eighth Amendment claims."), *report and recommendation adopted

by* 2022 WL 823648 (N.D.N.Y. Mar. 18, 2022); *Germano v. Cook*, No. 21-CV-0550, 2021 WL

2810170, at *5 (D. Conn. July 6, 2021) ("But absent allegations of an ongoing violation of a

prisoner's constitutional rights, such allegations that supervisors did not do enough after a

constitutional violation has already occurred is not enough to show personal involvement of

the supervisors in the violation of a prisoner's constitutional rights."); *Sawyer v. New York

State Dept. of Corr. Servs.*, No. 11-CV-0152, 2015 WL 6644112, at *6-7 (W.D.N.Y. June 30,

2015) (dismissing failure-to-protect claim against official who received inmate's grievance

expressing fear for his safety based on other inmates calling him a "rat" and a "snitch," even

though plaintiff alleged he was assaulted following an investigation of the grievance by

another official, noting that the amended complaint and documents attached thereto failed to

"reveal that Plaintiff ever asserted a physical attack was imminent such that [the official who received plaintiff's grievance] cannot be found to have known that Plaintiff was being threatened by certain inmates with actual or imminent harm" (internal quotation mark and citation omitted)), *report and recommendation adopted in pertinent part by* 2015 WL 6641471 (W.D.N.Y. Oct. 28, 2015); *Lombardo v. Stone*, No. 99-CV-4603, 2001 WL 940559, at *7 (S.D.N.Y. Aug. 20, 2001) ("Plaintiff's claims against Lee is that she failed to investigate her subordinates and preserve evidence against them. The failure to investigate is not sufficient to sustain an Eighth Amendment claim." (collecting cases)).

Finally, with respect to the Fourth Failure-to-Protect Claim, which is based on several named defendants participating in a labor strike that allegedly created safety risks within the facility, the complaint is devoid of allegations which plausibly suggest that any of the named defendants participated in the strike out of deliberate indifference to plaintiff's well-being. Furthermore, the Court rejects the premise of plaintiff's claim of wrongdoing insofar as it imposes a duty on corrections officials to work, regardless of their personal circumstances.

In light of the foregoing, plaintiff's First Failure-to-Protect Claim, Third Failure-to-Protect Claim against all defendants other than Stevenson, and Fourth Failure-to-Protect Claim are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 10. Conditions-of-Confinement Claims

To demonstrate that the conditions of confinement constitute cruel and unusual

85

punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element.  *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996).  A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly*, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference."  *Wilson*, 501 U.S. at 303-04.

Generally speaking, housing an incarcerated individual in restrictive confinement, without more, and notwithstanding the restrictions that such confinement imposes on ordinary inmate life, does not constitute cruel and unusual punishment.  *See Bowens v. Smith*, No. 9:11-CV-0784, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) ("Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment."), *report and recommendation adopted by* 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013); *Hamilton v. Fisher*, No. 9:10-CV-1066 (MAD/RFT), 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) ("'[N]ormal' conditions of SHU confinement do not constitute an Eighth Amendment violation." (citations omitted))*, report and recommendation adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012); *Jackson v. Johnson*, 15 F. Supp. 2d 341, 363 (S.D.N.Y. 1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment") (collecting cases); *Dixon v. Goord*, 224 F.Supp.2d 739, 748-49 (S.D.N.Y. 2002) (holding that "allegations of having been cut off from the prison population, a computer program, religious

services, legal research, medical showers and personal property, as well as limits on food access, and other normal incidents of SHU confinement," which lasted ten months, were "not violations of the Eighth Amendment"); *Marino v. Watts*, No. 12-CV-801, 2015 WL 5603454, at *3 (N.D.N.Y. May 29, 2015), *report and recommendation adopted in part, rejected in part on other grounds*, 2015 WL 5603472 (N.D.N.Y. Sept. 23, 2015) (inmate who was placed in SHU for two and one half months, during which he did not have "window ventilation, sunshine, or fresh air" in addition to other harsh conditions, failed to establish that the conditions were sufficiently serious under the objective prong of the Eighth Amendment/Due Process analysis); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *4 (S.D.N.Y. Feb. 17, 2015) (dismissing Eighth Amendment claim based on placement in SHU for six months with resulting loss of packages, commissary, and telephone privileges, noting that such deprivations "are not sufficient to give rise to an Eighth Amendment violation).

"However, courts are also cognizant that 'the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented,' including the fact that prolonged solitary confinement 'can and does lead to significant psychological harm.'" *Smith v. Annucci*, No. 6:18-CV-06261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (quoting *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)). "Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for extended periods of time, such that the effects are 'grossly disproportionate' to the reasons for the isolation." *Smith*, 2019 WL 539935, at *6

(citing, *inter alia*, *Peoples v. Fischer*, 898 F. Supp. 2d at 621); *see also Williams v. Korines*, No. 16-CV-1157 (FJS/TWD), 2017 WL 11458011, at *5 (N.D.N.Y. Jan. 5, 2017) ("[SHU] confinement is not 'abnormal' unless it is 'totally without penological justification,' 'grossly disproportionate,' or 'involve[s] the unnecessary and wanton infliction of pain.'" (quoting *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984))).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's First Conditions-of-Confinement Claim, Second Conditions-of-Confinement Claim, Fourth Conditions-of-Confinement Claim, Fifth Conditions-of-Confinement Claim, and Sixth Conditions-of-Confinement Claim survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

With respect to the Third Conditions-of-Confinement Claim, the complaint alleges that defendants J. Christopher and Fischer denied plaintiff access to out-of-cell programming at various times throughout his incarceration.  While the Court has allowed plaintiff to proceed with an Eighth Amendment claim based on the overall nature of his restrictive confinement in the Step-Down Program, plaintiff does not have an independent constitutional right to participate in out-of-cell programming that would trigger a separate Eighth Amendment claim. *See Lutz v. Cuomo*, No. 9:19-CV-0262 (BKS/CFH), 2019 WL 13369576, at *9 (N.D.N.Y. Apr. 12, 2019) ("[I]nmates have no constitutional right to participation in prison programs." (citing

*Murray v. Hulihan*, No. 9:08-CV-912 (NAM/ATB), 2010 WL 1235615, at *7 (N.D.N.Y. Mar. 17, 2010)), *adopted by* 2010 WL 1260140 (N.D.N.Y. Mar. 31, 2010), *aff'd*, 436 F. App'x 22 (2d Cir. 2011)); *Walker v. Bellnier*, No. 9:17-CV-1008 (GTS/CFH), 2017 WL 5135702, at *9 (N.D.N.Y. Nov. 3, 2017) ("[I]nmates do not have a constitutional right to participate in prison programs." (collecting cases)); *Harrison v. Fischer*, No. 08-CV-1327 (NAM/DRH), 2010 WL 2653629, at *8 (N.D.N.Y. June 7, 2010) (reasoning that discharge from prison programming is also not a constitutional violation).

With respect to the Seventh Conditions-of-Confinement Claim, which is based on allegations that defendant Martuscello suspended certain out-of-cell privileges during the labor strike, the Court has no basis to plausibly infer from the allegations in the complaint that this occurred based on defendant Martuscello's deliberate indifference to plaintiff's well-being, as opposed to for legitimate penological reasons, such as prisoner and employee safety. *Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests").

In light of the foregoing, plaintiff's Third Conditions-of-Confinement Claim and Seventh Conditions-of-Confinement Claim are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 11. Disciplinary Due Process Claims

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process.  *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir. 1996).

In *Sandin v. Conner,* 515 U.S. 472 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin,* 515 U.S. at 483-84; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.  To determine whether an inmate has suffered an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the general population of the facility as well as those in administrative and protective confinement.  *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) ("To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'") (quoting *Sandin*, 515 U.S. at 484).  When assessing the severity of the hardship imposed, a court should take into account both the duration and the

conditions of the confinement, where appropriate.  *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998).  While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon*, 215 F.3d at 232 n.5), the Second Circuit generally takes the position that disciplinary confinement, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions."  *Ortiz*, 380 F.3d at 654; *Colon*, 215 F.3d at 231.  As a general matter, "[a] period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship."  *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65 ("Where the plaintiff was confined for an intermediate duration -- between 101 and 305 days -- 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." (citing *Colon*, 215 F.3d at 232).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination.  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, inter alia, *Wolff v. McDonnell*, 418 U.S. 539, 563- 67 (1974)).  The hearing officer's

91

findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's First Disciplinary Due Process Claim, Third Disciplinary Due Process Claim against defendants Laliberte and Rodriguez, and Fourth Disciplinary Due Process Claim survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

With respect to the Second Disciplinary Due Process Claim, the complaint alleges that defendant Mayo issued plaintiff a misbehavior report in connection with his role in an altercation with inmate Bradley in April 2023, and defendant Storey thereafter found plaintiff guilty of the charges in the misbehavior report and sentenced him to six months of SHU confinement, which defendant Rodriguez affirmed. Compl. at 183-185. The complaint does not allege that plaintiff was innocent of the charges in the misbehavior report. Nor does the complaint include any details explaining how, if at all, plaintiff may have been denied the process to which he was entitled in connection with his disciplinary hearing. In other words, plaintiff has failed to adequately allege that he suffered a deprivation of his due process rights in connection with this disciplinary hearing.

Accordingly, plaintiff's Second Disciplinary Due Process Claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

With respect to the Third Disciplinary Due Process Claim, the complaint alleges that plaintiff was issued a misbehavior report in connection with a cup throwing incident on December 8, 2024, and defendant Lewis was assigned as plaintiff's assistant for his disciplinary hearing.  Compl. at 127-128.  The complaint further alleges that plaintiff asked defendant Lewis to gather certain evidence for his hearing on December 31, 2024, but later that day, plaintiff received defendant Laliberte's disciplinary disposition, which "falsely" indicated that plaintiff was "removed from the hearing for bad behavior" and found plaintiff guilty of the charges in the misbehavior report.  Compl. at 128-129.  While the Court will allow plaintiff to proceed with his due process claims against defendants Laliberte and Rodriguez, the Court has no basis to plausibly infer from the allegations in the complaint that defendant Lewis was personally involved in the alleged due process deprivation.  Indeed, by plaintiff's own allegations, by the time he spoke with defendant Lewis and requested assistance, defendant Laliberte had already reached a decision on the disciplinary charges.

Accordingly, insofar as plaintiff's Third Disciplinary Due Process Claim is asserted against ORC Lewis, that claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

With respect to the Fifth Disciplinary Due Process Claim, the complaint alleges that plaintiff was issued a misbehavior report by defendant Moss based on a milk throwing incident on May 4, 2025, and defendant Ciancio thereafter found plaintiff guilty of the charges and imposed an "excessively harsh sentence" that included loss of package, phone, tablet, commissary, and property privileges for 120 days and six months loss of good time credits. Compl. at 236-239.

Plaintiff does not allege that he was innocent of the charges in the misbehavior report. Nor does plaintiff explain how he believes he was denied the process to which he was entitled during his disciplinary hearing.  Rather, he alleges more generically that defendant Cinacio should not have served as the hearing officer based on a bias against plaintiff, and that the imposed sentence was "excessively harsh."  However, the fact that this official previously served as a hearing officer and issued a ruling that was reversed in a state court proceeding does not, without more, plausibly suggest that plaintiff was deprived of the process to which he was entitled.

Furthermore, a loss of privileges for 120 days, without any accompanying restrictive confinement, does not trigger a liberty interest.  *See, e.g., Burrell v. Durkin*, No. 9:22-CV-0102 (BKS/ML), 2022 WL 22955445, at *11 (N.D.N.Y. Apr. 20, 2022) ("Defendant LeClaire, however, sanctioned plaintiff only to 10 days of SHU confinement and 90 days loss of commissary, packages, and phone privileges. . . . None of these sanctions constitute an atypical or significant hardship under the Due Process Clause."); *Taylor v. Glover*, No. 21-

CV-06452, 2024 WL 5090172, at *8 (S.D.N.Y. Dec. 11, 2024) ("[C]ourts in the Second Circuit have consistently held the loss of commissary, package, and visitation privileges does not implicate liberty interests."); *McLellan v. Chapdelaine*, No. 16-CV-02032, 2017 WL 388804, at *4 (D. Conn. Jan. 27, 2017) (holding that loss of commissary for sixty days did not constitute significant or atypical hardship); *Woodward v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2016 WL 11906586, at *6 (N.D.N.Y. Oct. 19, 2016) ("[P]laintiff has not alleged facts which plausibly suggest that he enjoyed a protected liberty interest in being free from the sanction related to the conditions of his confinement – ninety (90) days loss of privileges."); *Alexander v. Fischer*, No. 9:14-CV-0548 (GLS/ATB), 2015 WL 10568892, at *4 (N.D.N.Y. Dec. 21, 2015) ("The loss of visitation and related privileges, the only other deprivations identified by plaintiff, do not rise to the level of an 'atypical and significant hardship' so as to create a liberty interest protected by procedural due process."), adopted by 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016); *Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) ("[T]he loss of phones, packages, and commissary privileges does not  give rise to a protected liberty interest under New York law.").[9]

---

[9]  Because the sanction allegedly included a loss of good time credits, the disciplinary sentence subjected plaintiff to "mixed sanctions" affecting both the duration (recommended good time loss) and conditions of his confinement (loss of privileges), and plaintiff has not alleged that the disciplinary determination was reversed in an Article 78 proceeding.  Thus, even if the loss of privileges could be deemed sufficient to trigger a liberty interest, plaintiff's claim would still be barred by the favorable termination rule articulated in *Heck v. Humphrey*, 512 U.S. 477 (1994) unless he "abandon[ed], not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding[s] he is attacking in [this] § 1983 suit."  *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006) (holding that "a prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but . . . he can only do so if he is willing to forgo*

Accordingly, plaintiff's Fifth Disciplinary Due Process Claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

Finally, with respect to the Sixth Disciplinary Due Process Claim, the Court finds that the complaint alleges sufficient facts for this claim to survive sua sponte review and require a response.  However, the disciplinary sentence imposed by defendant Stanley implicates the validity of plaintiff's disciplinary conviction and sentence because plaintiff was subjected to "mixed sanctions" affecting both the duration (recommended good time loss) and conditions of his confinement (SHU).  *See* Compl. at 233-236.  Moreover, plaintiff alleges that his Article 78 proceeding was pending as of the filing of the complaint.  *Id*. at 236.

Since plaintiff has not demonstrated that his disciplinary disposition has been invalidated, *Heck* bars this due process claim unless plaintiff "abandon[s], not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding[s] he is attacking in [this] § 1983 suit." *Peralta*, 467 F.3d at 104.  Accordingly, the Court directs plaintiff to advise the Court in writing, within thirty (30) days of the filing date of this Decision and Order, whether he waives for all times all claims relating to the disciplinary sanctions imposed by defendant Stanley affecting the duration of his confinement in order to proceed with his claims challenging the sanctions

---

*once and for all any challenge to any sanctions that affect the duration of his confinement*" (emphasis in original)).

affecting the conditions of his confinement.  The Court specifically advises plaintiff that his failure to file this statement (the "*Peralta* Waiver") within the required time will be interpreted as his refusal to waive these claims, and such failure will result in the dismissal without prejudice of the Sixth Disciplinary Due Process Claim.

### 12. Due Process Claim Based on OBS Cell Placement

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's due process claim against defendants Ferrone, Henry, Walker, McGraw, Shue, Patek, Gabel, and Corrections Lieutenant John Doe based on placing plaintiff in an OBS cell in December 2024 without a hearing survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 13. Due Process Claim Based on "Negative Informationals"

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's due process claims against defendant Hughes and the PMT members based on the imposition of "negative informationals" and "false refusals" that resulted in plaintiff being denied privileges without a hearing survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 14. Medical Privacy Claims

The Second Circuit has recognized a constitutional right to privacy, which protects "the individual interest in avoiding disclosure of personal matters." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (citation omitted). Specifically, the Due Process Clause of the Fourteenth Amendment protects a "right to privacy [that] can be characterized as a right to 'confidentiality,'" which "includes the right to protection regarding information about the state of one's health." *Doe v. City of N.Y.*, 15 F.3d 264, 267 (2d Cir. 1994). "[P]risoners retain a right to privacy for medical information unless (1) that disclosure was reasonably related to legitimate penological interests or (2) the information ... was not the type of sensitive medical information contemplated by the courts for constitutional protection." *Simon v. N.Y.C. Dep't of Corr.*, No. 12-CV-8624, 2013 WL 4792840, at *2 (S.D.N.Y. Aug. 29, 2013) (citing *Powell v. Schriver*, 175 F.3d 107, 111-13 (2d Cir. 1999)).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's medical privacy claims against defendant Mohammed, Ferguson, and Schrader survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 15. Destruction of Property Claims

The Supreme Court has held that even the unauthorized intentional destruction of a prisoner's property may not be the basis for constitutional claims if sufficient post deprivation

remedies are available to address the claim.  *Hudson*, 468 U.S. at 531 (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *see also Rivera-Powell v. New York City Board of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) ("When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post deprivation remedy.").  As noted, "New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action." *Jackson*, 256 F.3d at 96; *Davis*, 311 Fed. App'x at 400 ("The existence of this adequate post-deprivation state remedy would thus preclude [plaintiff's] due process claim under § 1983 [for lost personal property].").  Moreover, the complaint is devoid of allegations which plausibly suggest that adequate post-deprivation remedies to pursue expenses associated with plaintiff's lost or destroyed property were or are unavailable to him.

Accordingly, plaintiff's Fourteenth Amendment due process claim based on the loss or destruction of personal property is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 16. Denial of Adequate Grievance Channels

It is well-settled that an incarcerated individual has no constitutional right of access to an internal grievance process.  *Rhodes v. Hoy*, No. 9:05-CV-0836 (FJS/DEP), 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi*, No. 9:01-CV-0285

(PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under Section 1983). Thus, an alleged failure to afford an incarcerated individual meaningful access to the internal grievance procedure, or meaningfully consider a grievance, does not give rise to a cognizable constitutional claim. *See Perrilla v. Fischer*, No. 13-CV-0398, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) ("[A]llegations against [the Superintendent] and the IGRC Supervisor are subject to dismissal because it is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement."); *Johnson v. McKay*, No. 9:14-CV-0803 (BKS/TWD), 2015 WL 1735102, at *6 (N.D.N.Y. Apr. 16, 2015) ("[E]ven assuming that defendants denied plaintiff evidence for or access to inmate grievance procedures at Upstate Correctional Facility, such facts simply do not implicate the First Amendment or give rise to a constitutional claim.").

Furthermore, inmates do not have a due process right to an investigation requested through a grievance. *See DeShaney v. Winnebego Soc. Servs*., 489 U.S. 189, 196 (1989) (The Due Process Clause "generally confers no affirmative right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."); *Pine v. Seally*, No. 9:09-CV-1198

100

(DNH/ATB), 2011 WL 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("To the extent that plaintiffs attempt to assert a separate constitutional claim of 'failure to investigate,' the law is . . . clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials.") (citing *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (collecting cases)); *Torres v. Mazzurca*, 246 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2003) (Inmates do not have a due process right to a thorough investigation of grievances).

Accordingly, insofar as the complaint may be construed to assert Fourteenth Amendment due process claims related to plaintiff's lack of meaningful access to grievance channels and/or the alleged failure to process and consider plaintiff's grievances, such claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 17. HIPPA Claims

To the extent that plaintiff claims that his HIPPA rights were violated, "there is no private right of action under HIPAA, express or implied." *Meadows v. United Servs., Inc*., 963 F.3d 240, 242 (2d Cir. 2020) (per curiam). "Instead, HIPAA provides for penalties to be imposed by the Secretary of the Department of Health and Human Services." *Id*. at 244.

Accordingly, plaintiff's HIPPA claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 18. Violation of the HALT Act

Insofar as plaintiff has asserted one or more claims under the HALT Act, there are at least three problems with allowing plaintiff to litigate his claims under this statute in this case. First, New York Correction Law § 24 provides a jurisdictional limitation regarding state law claims asserted against any officer or employee of the New York State Department of Corrections and Community Supervision ("DOCCS"), and thus, "the Court is obligated to address the issue on initial review." *See Flynn v. Ward*, No. 9:15-CV-1028 (GLS/CFH), 2015 WL 8056060, at *6 (N.D.N.Y. Dec. 4, 2015). "Claims for damages arising out of a DOCCS employee's act performed within the scope of his employment may be maintained in the New York Court of Claims as a claim against the State of New York." *Heyliger v. Gebler*, 496 F. Supp. 2d 250, 252 (W.D.N.Y. 2007). Courts look at the following factors to determine whether a defendant's action is within the scope of employment:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in the actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could have reasonably anticipated.

*Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997) (quotations and citations omitted).

The test to determine whether the defendants' actions fall within the scope of their employment is "whether the act was done while the servant was doing his master's work no matter how irregularly, or with what disregard of the instructions." *Cruz v. New York*, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (citing *Cepeda v. Coughlin*, 128 A.D.2d 995, 996 (3d

102

Dep't 1987)).  "In certain circumstances, conduct that is 'prompted by purely personal reasons unrelated to the employers' interest,' or 'an intentional course of conduct contrary to institutional rules, training and common sense,' may be found outside the scope of employment."  *Flynn*, 2015 WL 8056060, at *6 (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. and Cmty. Supervision*, No. 11-CV-0079, 2013 W L 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)).

Here, the complaint lacks allegations which plausibly suggest that any of the named defendants who were responsible for plaintiff's restrictive confinement acted for purely personal reasons unrelated to the employers' interest.

Second, even assuming that New York Correction Law § 24 does not present a jurisdictional bar to plaintiff's claim under the HALT Act, the federal statute governing the exercise of supplemental jurisdiction over state law claims allows this Court to exercise supplemental jurisdiction over claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, even where such a relationship exists between federal and state claims, 28 U.S.C. § 1367(c) provides that the district court "may decline to exercise supplemental jurisdiction" for any of the following reasons: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district

court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional

circumstances, there are other compelling reasons for declining jurisdiction."

The Court has little trouble concluding that plaintiff's claims under the HALT Act raise

novel issues of state law.  For example, it is not entirely clear whether the law contemplates a

private right of action.  *Compare Suarez v. Annucci*, No. 20-CV-7133, 2021 WL 6065765, at

*13 (S.D.N.Y. Dec. 21, 2021) (holding that, for claims involving a prisoner with serious mental

illness who had been confined in segregated housing, "Section 137(6) does include a private

right of action consistent with the legislative purposes and scheme"), *with Correa v. Lynch*,

No. 20-CV-2875, 2021 WL 2036697, at *8 (S.D.N.Y. May 20, 2021) (holding that there is no

private right of action allowing a prisoner to sue for a violation of N.Y. Corr. Law § 137(5),

which prohibits "degrading treatment" or most corporal punishment).  Furthermore, even if the

Court were to assume that the HALT Act contemplates a private right of action, it is unclear

how damages should be calculated, or whether additional damages may be awarded by a

federal court that cannot be awarded to plaintiff in an Article 78 proceeding.  These

uncertainties present "other compelling reasons" for this Court to decline to exercise

supplemental jurisdiction over plaintiff's state law claim.  *See* 28 U.S.C. § 1367(c)(4).

Third, plaintiff acknowledges in his pleading that he filed an action in the New York

Court of Claims, which is "intertwined with [and] related to this matter[.]"  *See* Compl. at 23.

The status of that proceeding is unknown.  However, "[o]nce a party chooses to litigate his

claims by way of an Article 78 proceeding, he assumes the risk of collateral estoppel being

applied in a subsequent proceeding such as a § 1983 action." *Fortunatus v. Clinton Cnty.,*
*N.Y.*, 937 F. Supp. 2d 320, 332 (N.D.N.Y. 2013) (citing *Giakoumelos v. Coughlin*, 88 F.3d 56
(2d Cir. 1996) (applying collateral estoppel to a previous Article 78 judgment where the
plaintiff failed to show that there were procedural deficiencies or a lack of an opportunity to
litigate)).  Thus, while there does not appear to be any prejudice to this Court declining to
exercise supplemental jurisdiction over plaintiff's state law claim, there are undoubtedly
concerns with doing the opposite.

    In light of the foregoing, the Court declines to exercise supplemental jurisdiction over
plaintiff's claims under the HALT Act.

## IV.    FIRST MOTION FOR INJUNCTIVE RELIEF

    Preliminary injunctive relief "'is an extraordinary and drastic remedy, one that should
not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"
*Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting
*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  "In general, district courts may grant a
preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two
related standards: 'either (a) a likelihood  of success on the merits, or (b) sufficiently serious
questions going to the merits of its claims to make them fair ground for litigation, plus a
balance of the hardships tipping decidedly in favor of the moving party.'"  *Otoe-Missouria*
*Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d  Cir. 2014)
(quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks

omitted)). However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted)). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts.*, 598 F.3d at 35 n.4) (internal quotation marks omitted)); *see also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (a plaintiff seeking a mandatory injunction must make a "clear" or "substantial" showing of a likelihood of success on the merits of his claim).

The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at * 2 (E.D.N.Y. Jul. 31, 2008). The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons."

*Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994)) (other citations omitted).

"'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'"  *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.*, 437 Fed. App'x 57, 58 (2d Cir. 2011) (summary order) (quoting *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  Generally, an alleged violation of a constitutional right creates a presumption of irreparable harm.  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).  However, speculative, remote or future injury is not the province of injunctive relief.  *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983); *see also Garcia v. Arevalo*, No. 93-CV-8147, 1994 WL 383238, at *2 (S.D.N.Y. June 27, 1994) ("It is well settled that an allegation of the mere possibility of irreparable harm is insufficient to justify the drastic remedy of preliminary injunction. . . . A party who seeks the extraordinary remedy of a preliminary injunction must show the alleged irreparable harm to be imminent, not remote or speculative, and the alleged injury to constitute one that is incapable of being fully remedied by monetary damages." (citations omitted)).

Plaintiff's motion seeks affirmative injunctive relief directing officials to "provide a medically appropriate course of orthopedic follow-ups" for plaintiff's right knee, schedule "follow-up treatment with the endocrinologist" for plaintiff's thyroid and adrenal gland abnormalities, reschedule an MRI for plaintiff's lower back, and transfer plaintiff to "an

appropriate correctional facility Special Population [and] or protective custody." *See* First Motion for Injunctive Relief at 1-2.

Insofar as plaintiff seeks a transfer to another facility, in general, it is DOCCS, and not this Court, that determines where plaintiff will be housed during his period of incarceration. *See Meachum v. Fano*, 427 U.S. 215, 229 (1976) (stating that "[t]he federal courts do not sit to supervise state prisons, the administration of which is [of] acute interest to the States") (citations omitted); *Olim v. Wakinekona*, 461 U.S. 238, 248-49 (1983) (stating that inmates have no right to be confined in a particular state or particular prison within a given state); *Montayne v. Haymes*, 427 U.S. 236, 243 (1976) (holding that New York state prisoners have no right to incarceration at a particular prison facility). It is well-established that DOCCS has "broad leeway in deciding where to house the inmates under its protective care." *McFadden v. Solfaro*, Nos. 95-CV-1148, 95-CV-3790, 1998 WL 199923, at *10 (S.D.N.Y. Apr. 23, 1998).

With that said, upon review of the file in this matter, the Court finds that a response to plaintiff's First Preliminary Injunction Motion must be filed by the surviving defendants. The Court directs these defendants, or their counsel, to respond to plaintiff's motion (Dkt. No. 2) within thirty (30) days of the date of service of the summons and complaint upon any defendant. After a defendant has filed a response to the motion, the Clerk shall return this file to the Court for further review.

## V.    FURTHER FILINGS

As noted, this action was initially comprised of a 360-page handwritten complaint and 264 pages of exhibits.  Since the complaint was filed, the Court has received over 1000 pages of documents from plaintiff.  *See* Dkt. Nos. 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18.

By Text Order entered on October 16, 2025, the Honorable Miroslav Lovric advised plaintiff that this Court "does not accept submissions on a rolling basis[,]" and that "any further submissions prior to a ruling on the sufficiency of the complaint . . . [would] be stricken from the docket."  Dkt. No. 19.  Despite this Text Order, plaintiff has continued to file documents with the Court.  *See* Dkt. Nos. 20, 21.

District courts have the "inherent authority to manage their dockets" to promote "the efficient and expedient resolution of cases."  *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) (citations omitted).  "Absent extraordinary circumstances, such as a demonstrated history of frivolous and vexatious litigation, . . . or a failure to comply with sanctions imposed for such conduct, . . . a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure."  *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 649 (2d Cir. 1987).  However, an action cannot proceed unless and until service is completed.  Although it is the Court's obligation to assist with service when a pro se prisoner is proceeding in forma pauperis, *see* Fed. R. Civ. P. 4(c)(3) (Marshals Service must be appointed to serve process when plaintiff is authorized to proceed in forma pauperis); 28 U.S.C. § 1915(d) ("[T]he officers of the court shall issue and serve all process and perform all

duties in [in forma pauperis] cases."); *see also Wright v. Lewis*, 76 F.3d 57, 59 (2d Cir. 1996)

("By granting Wright leave to pursue his § 1983 claim in forma pauperis, Magistrate Smith

shifted the responsibility for serving the complaint from Wright to the court."); *Kavazanjian v.*

*Rice*, No. 03-CV-1923, 2005 WL 1377946, at *2 (E.D.N.Y., June 6, 2005) (noting that "[f]or

plaintiffs proceeding in forma pauperis . . ., the U.S. Marshal's Office—not the plaintiff—is

primarily responsible for effecting service."), the Court cannot do so unless and until the pro

se prisoner has provided the required documents.  *See Carpio v. Luther*, No. 06-CV-0857,

2009 WL 605300, at *1 (W.D.N.Y. Mar. 9, 2009) (acknowledging the Court's "obligation to

assist a pro se incarcerated litigant . . . to cause the summons and complaint to be served"

but noting further that "the plaintiff nonetheless retains the obligation to provide the necessary

information" for this to occur).[10]

Moreover, Rule 41(b) of the Federal Rules of Civil Procedure provides that a court

may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute it, or

to comply with the procedural rules or orders of the court.  Fed. R. Civ. P. 41(b); *see also Link*

*v. Wabash R.R. Co*., 370 U.S. 626 (1962).  This power to dismiss may be exercised when

necessary to achieve orderly and expeditious disposition of cases.  *See Freeman v.*

*Lundrigan*, No. 95-CV-1190 (RSP/RWS), 1996 WL 481534, at *1 (N.D.N.Y. Aug. 22, 1996).

---

[10] Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, in the absence of a showing of good cause, "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."

In light of the foregoing, and plaintiff's burdensome practices to date, which has resulted in this Court spending considerable time on this matter, plaintiff is advised that he must provide the Court with all necessary copies of his complaint in order for this case to proceed.  Plaintiff is further advised that the Court will not (1) consider any further submissions from him until after receipt of the copies necessary for service, or (2) accept any further pleading submissions from him until after the completion of service, at which point any further amendment must identify any remaining "Doe" officials in this case, and be limited to the events discussed in the original complaint.

## VI.    CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's IFP Application (Dkt. No. 3) is **GRANTED**.[11]   The Clerk shall provide the superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form (Dkt. No. 4), and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk shall provide a copy of plaintiff's authorization form (Dkt. No. 4) to the Financial Deputy of the Clerk's Office; and it is further

---

[11]  Plaintiff should note that although his IFP Application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

111

**ORDERED** that the Clerk shall update the docket to identify "Maintenance Man Slim" as "Dutcher"; and it is further

**ORDERED** that the following Section 1983 claims **SURVIVE** sua sponte review and require a response: (1) each of plaintiff's retaliation claims; (2) plaintiff's mail tampering claims; (3) plaintiff's free exercise claims; (4) plaintiff's Fourth Amendment privacy claims; (5) each of plaintiff's excessive force and failure-to-intervene claims; (6) plaintiff's First Medical Indifference Claim except insofar as that claim is asserted against defendant Rosario; (7) plaintiff's Third Medical Indifference Claim; (8) plaintiff's Fourth Medical Indifference Claim; (9) plaintiff's Fifth Medical Indifference Claim except insofar as that claim is asserted against Nurse Jane Doe #1 and Nurse Jane Doe #2; (10) plaintiff's Sixth Medical Indifference Claim; (11) plaintiff's Eighth Medical Indifference Claim; (12) plaintiff's Ninth Medical Indifference Claim"); (13) plaintiff's Tenth Medical Indifference Claim; (14) plaintiff's Eleventh Medical Indifference Claim; (15) plaintiff's Second Failure-to-Protect Claim; (16) plaintiff's Third Failure-to-Protect Claim insofar as it is asserted against defendant Stevenson; (17) plaintiff's First Conditions-of-Confinement Claim; (18) plaintiff's Second Conditions-of-Confinement Claim; (19) plaintiff's Fourth Conditions-of-Confinement Claim; (20) plaintiff's Fifth Conditions-of-Confinement Claim; (21) plaintiff's Sixth Conditions-of-Confinement Claim; (22) plaintiff's First Disciplinary Due Process Claim; (23) plaintiff's Third Disciplinary Due Process Claim except insofar as it is asserted against ORC Lewis; (24) plaintiff's Fourth Disciplinary Due Process Claim; (25) plaintiff's Fourteenth Amendment due process claims against defendants

Ferrone, Henry, Walker, McGraw, Shue, Patek, Gabel, and Corrections Lieutenant John Doe based on placing plaintiff in an OBS cell in December 2024 without a hearing; (26) plaintiff's Fourteenth Amendment due process claims against the PMT members and defendant Hughes based on the imposition of "negative informationals" and "false refusals" that resulted in the denial of privileges without a hearing; (27) plaintiff's Fourteenth Amendment medical privacy claims against defendants Mohammed, Ferguson, and Schrader; and it is further

ORDERED that plaintiff advise the Court in writing, **within thirty (30) days of the filing date of this Decision and Order**, whether he waives for all times all claims in this action relating to the Sixth Disciplinary Due Process Claim, i.e., the disciplinary sanctions imposed by defendant Stanley on or around June 2, 2025, affecting the duration of his confinement (i.e., the loss of good time) in order to proceed with his claims challenging the sanctions affecting the conditions of his confinement.[12]  The Court specifically advises plaintiff that his failure to file this "*Peralta* Waiver" within the required time will be interpreted as his refusal to waive these claims, and such failure will result in the dismissal without prejudice of the Fourteenth Amendment due process claims against defendants Christopher and Stanley; and it is further

---

[12] In the alternative, plaintiff may demonstrate that the disciplinary sentence was reversed or invalidated.

113

**ORDERED** that the Court declines to exercise supplemental jurisdiction over plaintiff's claims under N.Y. Correction Law § 137(6), which are **DISMISSED without prejudice** pursuant to Fed. R. Civ. P. 12(b)(1) and 28 U.S.C. § 1367(c); and it is further

**ORDERED** that plaintiff's remaining Section 1983 claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted;[13] and it is further

**ORDERED** that plaintiff's Second Motion for Injunctive Relief (Dkt. No. 11) is **DENIED** as duplicative of the First Motion for Injunctive Relief; and it is further

**ORDERED** that a response to plaintiff's first motion for preliminary injunctive relief (Dkt. No. 2) be filed by the remaining defendants, or their counsel, within thirty (30) days of the date of service of the summons and complaint on any defendant; and it is further

**ORDERED** that upon receipt from plaintiff of 119 copies of his complaint (without exhibits), the Clerk shall issue summonses and forward them, along with these copies, to the United States Marshal for service upon defendants Chandler, Mazzone, Manson, Hamilton, Penree, Surgey, Clapper, Schrader, Chaudry, Czerwinski, Schrader, Dana, Candy Hayes, Banks, Brown, Walhby, Ajukik, Hosma, Mohammed, Abdelwahab, Noble, Max, Deck, Ardo,

---

[13] Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint, subject to the limitations set forth above.  Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised.  Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.  Plaintiff's deadline to amend his pleading as a matter of course is set forth in Rule 15(a) of the Federal Rules of Civil Procedure.

Venetozzi, Conrad, Passage, Hilton, McKoy, Mayo, Klien, Hall, Yaddow, Tapia, Ross, Patek,

Gabel, Shue, Lamoch, Aiken, Kallay, Jennifer Christopher, Christopher Hayes, Hoffman,

LaCoppola, Nurse Jane Doe, Russell, Paladino, Fischer, Harris, Storey, Fish, Kallay,

Dorchester, Perham, Schiavi, Tourtelot, Costello, Dundden, Johnson, Carpenter, Bishop,

Murphy, Mosher, Laliberte, Ferrone, Prisma, Walker, Reddner, Slate, Hark, Smalls, Henry,

McGraw, Sullivan, Martuscello, Annucci, Rodriguez, Matlock, Stevens, Gardner, Dehli,

Martin, Nicholas, Peters, Ferris, Ward, Corrections Officer Lewis, Lavinski, Kowalski, Fuse,

Bailey, Cole, Klossner, C. Zangari, D. Zangari, Galusha, Fear, Ortiz, Bartlett, Townsend,

Moss, Seguin, Luther, Annarino, Stevenson, Johnson, Hamlin, Worden, Rogers, Short, Fann,

Mr. Dutcher, Burns, Barbosa, Ciancio, Everson, Stanley, and Hughes (collectively, the "Non-

Doe Surviving Defendants").[14]  The Clerk shall forward a copy of the summons and complaint

by electronic mail to the Office of the New York State Attorney General, together with a copy

of this Decision and Order; and it is further

     **ORDERED** that the Clerk **TERMINATE** all officials other than the aforementioned

defendants for which the Clerk has been directed to issue summonses; and it is further

     **ORDERED** that plaintiff take reasonable steps to ascertain the identity of the

remaining "Doe" defendants, and when identified, seek to amend the complaint to add the

---

[14]  Summonses will not issue for Corrections Officers John Doe #1-5, Corrections Lieutenant John Doe, John Doe Short Guy, John Doe Tall Guy, and National Guard Officer John Doe because the U.S. Marshal cannot effect service on an individual who has not been identified by name.

individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a); and it is further

**ORDERED** that a response to the complaint be filed by the Non-Doe Surviving Defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED**.

Dated:  November 24, 2025
        Utica, New York.

Anthony J. Brindisi
U.S. District Judge

116